Albert W. TURNER and Therese L. Turner, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

Albert W. TURNER and Therese L. Turner, Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant.

Nos. 75–2137, 75–2138.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1976.

Decided Sept. 17, 1976.

---

**1250**

John S. Nolan, Washington, D. C. (F. Brook Voght, Miller & Chevalier, Wallace E. Whitmore, Michael William Sacks, Wilkes & Artis, Washington, D. C., on brief), for Albert and Therese Turner.

Leonard J. Henzke, Jr., Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Jr., and Sharon A. Darling, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief), for C. I. R.

Before HAYNSWORTH, Chief Judge, and WINTER and WIDENER, Circuit Judges.

HAYNSWORTH, Chief Judge:

After having owned a farm for a number of years, the taxpayer sold it to a related development company. On his income tax return he claimed the profit as a capital gain, but the Tax Court held it to be ordinary income, concluding, also, that in earlier real estate transactions he had acted as a dealer. On appeal, the taxpayer does not contest the Tax Court's conclusions with respect to the earlier transactions, but he does contend that the Tax Court improperly concluded that the 1965 transaction was not the sale of a capital asset. We conclude that the farm was held as a capital asset and that the Tax Court erroneously denied capital gain treatment of the profit.

In 1937, Turner began a small unincorporated construction business in which he was both manager and laborer. The business grew, and, by 1949, its operations had expanded to such an extent that Turner and an employee organized a corporation, Modern Construction Company, Inc., the name of which was later changed to Maryland Community Developers, Inc., through which to operate the business. Since 1949, Maryland Community Developers has been engaged generally in the development of residential housing projects in the Maryland suburbs of Washington, D.C. Before 1965, there were four such major projects, and it is out of three of them that this tax controversy arose.

In 1949 Turner individually acquired one hundred and seven acres of unimproved land in Prince Georges County, Maryland. He planned a subdivision of it, named it "Hollywood," and transferred four hundred and eighty five lots to MCD. Some of these lots were transferred through outright sales, while, in the transfer of others, redeemable ground leases were employed. Between 1949 and 1955, MCD constructed five hundred and fifty five homes in the Hollywood subdivision.

In 1951, Turner purchased 337 acres of undeveloped land, most of which he subsequently sold to MCD for development as the Carrollton subdivision. Later, MCD acquired adjacent land, some of it through

Turner, for incorporation in the Carrollton subdivision. By 1962, MCD had constructed two thousand houses in Carrollton, completing construction in the subdivision. Two hundred and seventy of the five hundred and eighty two acres in the subdivision had been acquired by MCD from Turner.

Hollywood and Carrollton are involved in the tax years 1962–1965, because in those years Turner was still receiving installment payments and funds from the redemption of ground leases. He claimed capital gain treatment for those receipts, but his acquiescence in the Tax Court's determination that he was not entitled to that treatment was clearly warranted. When those lots were acquired by Turner, MCD was in its infancy. It could not afford investment in large tracts of land for development and house construction in planned subdivisions. Turner seems clearly to have been using his own financial resources to provide MCD's inventory of lots and, in each instance, his initial acquisition of the land appears to have been solely for the purpose of its development by MCD.

As early as 1958, however, Turner was interested in buying two farms near Largo, Maryland. He thought that, ultimately, urban expansion would reach them. They were zoned for rural residential use; there were no water or sewer lines in the area, and, apparently, none were then contemplated.

In 1961 the Calvert Farm became available for purchase, and Turner bought it for $524,000. He had a boundary survey run on the farm, but did nothing to develop plans for its subdivision. He added no improvements to it. For a few years after his purchase of the Calvert Farm, he rented some of the land to share croppers for the cultivation of tobacco.

In 1964, Seton Belt Farm, adjoining Calvert, became available for purchase. The owner made a public solicitation for sealed bids, and the five hundred and seventy four acre farm was sold to MCD for $4,550 per acre.

In 1964, the advent of municipal water and sewerage in the area of the Calvert and Seton Belt Farms appeared imminent, although, according to Turner, this development occurred much sooner than he anticipated in 1961 when he had purchased the Calvert Farm. Thus, after MCD's acquisition of the Seton Belt Farm, Turner and the other officers of MCD discussed the possibility of a joint development of the two farms as a planned community. These discussions led to an agreement that MCD would purchase the Calvert Farm from Turner for $4,000 per acre payable by an assumption of Turner's two mortgages on the farm, a conveyance to Turner of seventy-five specific acres of the Seton Belt Farm which they thought could be developed for commercial use, together with some cash and a promissory note for the balance. This transaction was consummated in 1965, except, by agreement, there was no formal conveyance of the seventy-five acres from the Seton Belt Farm to Turner. This was because no development could proceed until there was a general rezoning of all of the land involved, and it was thought that such rezoning could be more readily achieved if one comprehensive development plan were presented by one registered owner.

The necessary rezoning of the Calvert and Seton Belt Farms was not obtained until August 1967. In October of that year, Turner received a deed to the seventy-five Seton Belt Farm acres which MCD had agreed to convey to him for possible commercial development.

On his 1965 tax return, Turner reported the sale of the Calvert Farm as a long term capital gain.[1] He also elected to report his Calvert Farm gain on the installment method.[2]

The Tax Court concluded that Turner had been a "joint participant" with MCD in the Calvert Farm acquisition and development as with the earlier Hollywood and Carrollton subdivisions. It concluded that he was in the business of buying and selling real

---

1. 26 U.S.C.A. § 1201, et seq.

2. 26 U.S.C.A. § 453(b).

estate for subdivision and development and that he had acquired Calvert Farm in his capacity as a dealer. With respect to the seventy-five acres of Seton Belt that MCD had agreed to convey to Turner, the Tax Court assigned to it a value of $4,000 per acre for the purpose of § 453 installment sale computations, but it did not include the value of those seventy-five acres in Turner's taxable income for 1965 because he had not acquired the legal title to them until 1967.

In accordance with the then position of the Commissioner, this court has held that whether property is primarily held for sale in the ordinary course of business for purposes of § 1221(1) is a factual question subject to the clearly erroneous rule. *See, e. g. Industrial Life Insurance Company v. United States*, 4 Cir., 481 F.2d 609; *Tidwell v. Commissioner*, 4 Cir., 298 F.2d 864. Now the Commissioner has reversed himself; he now urges that we treat the question as one of law, reviewable without the restrictions of the clearly erroneous standard. This approach has been adopted by the Third and Fifth Circuits, *Pennroad v. Commissioner*, 3 Cir., 261 F.2d 325, and *United States v. Winthrop*, 5 Cir., 417 F.2d 905. Under the circumstances, we will apply the clearly erroneous rule to the Tax Court's resolution of subordinate facts, but we will accept the Commissioner's invitation to treat the ultimate conclusion to be drawn from those facts as a question of law.

A real estate dealer may acquire parcels of land as long term investments. When he does, he is entitled to be treated as an investor and to have capital gains treatment of his profit. *Municipal Bond Corporation v. Commissioner*, 8 Cir., 382 F.2d 184, 188; *Scheuber v. Commissioner*, 7 Cir., 371 F.2d 996, 998. This, the Tax Court seems to have realized, for in concluding that Turner had been a "joint participant" with MCD in the development of the three subdivisions, the Tax Court stated:

"While the facts varied somewhat in regard to each individual property, the pattern was basically the same and we do not consider the variations sufficient to cause us to reach differing results as to some properties."

There are, however, several crucial factual differences between the Hollywood and Carrollton developments on the one hand, and the acquisition and sale of Calvert Farm on the other.

Turner clearly acquired the Hollywood and Carrollton lands for the purpose of their development by MCD. MCD's development of them proceeded promptly after Turner's acquisition of those lands. Turner conveyed the Hollywood and Carrollton lands to MCD in periodic sales, usually on a lot by lot basis, and these lot transfers, in each instance, extended over a period of several years. In contrast, in 1961, MCD had no interest in the Calvert Farm. It was not in the business of making long term investments in land. It was in the development and construction business and wished to apply its resources to those purposes. Turner was the owner of Calvert Farm for more than four years, during which time its only use was for agricultural purposes. He neither offered it for sale nor planned a subdivision of it. When it was sold to MCD in 1965, there was one isolated, bulk sale of it, rather than a succession of transfers of lots or small parcels upon which immediate house construction could begin.

Between 1951 and 1961, the financial condition of MCD had undergone great change. When Hollywood and Carrollton were begun, MCD had only small capital resources. It lacked the financial capacity to acquire relatively large tracts for subdivision and development. It was dependent upon Turner for that purpose. By 1961, however, MCD had grown and matured into a soundly financed enterprise. It was able to finance its own acquisitions for its development purposes, as it did in 1964 when it acquired the Seton Belt Farm.[3] Had it

---

3. In 1962, MCD purchased 607 acres from unrelated sellers for its Calverton subdivision. By 1968, it had constructed and sold 1,500 houses in Calverton. This is a further indication of MCD's financial strength and independence in the 1960's. It was carrying its own inventory of lots and was no longer looking to Turner for inventory financing.

wished to move into the investment business in 1961, it, rather than Turner, could have purchased the Calvert Farm. It did not, because it seemed that several years must go by before the Calvert Farm would be susceptible to practical development.

In 1961, Calvert Farm was rural agricultural land, apparently many years away from any other practical use. During the next four years, it was used only for agricultural purposes. It brought a relatively high price in 1961 because it was thought that, ultimately, spreading urbanization would reach it, but one who acquires property under those circumstances with a hope of ultimate capital enhancement, acts as an investor and not as a dealer. Nor is there a basis for a finding what Turner would have done with Calvert Farm had some one other than MCD become the purchaser of Seton Belt in 1964.

Under all of these circumstances, we find the conclusion inescapable that Turner purchased Calvert Farm in 1961 as an investment in the hope of ultimate appreciation in value. It follows that he was entitled to capital gain treatment of his profit.

With respect to the seventy-five Seton Belt acres received by Turner, we think their value should have been included in Turner's gain recognized in 1965. He became their equitable owner in that year. Though there was a provision in the agreement that if commercial zoning for less than one hundred fifty acres was obtained, Turner's seventy-five acres would be subject to proportional reduction, he being compensated for the deficiency at the rate of $4,000 per acre, his right to that parcel was otherwise unconditional. Indeed, the only reason for not completing the transfer of legal title in 1965 was the supposed convenience in obtaining rezoning of all of the Calvert and Seton Belt properties. Delay in the transfer of legal title for the sake of convenience and the presence of a possible condition subsequent ought not to obscure the fact that in every real respect Turner became the owner of those seventy-five acres in 1965. Their value should be included with the other consideration he received in 1965 for Calvert Farm.

For the purpose of its installment sales calculations, the Tax Court assigned a value of $4,000 per acre to the seventy-five acres assigned to Turner from Seton Belt Farm. The parties had tentatively assigned the same value to those acres in the event of a commercial zoning underfall. The Tax Court, however, made no express finding as to their actual value as a part of the consideration paid to Turner. In 1965 they had not been rezoned for commercial use, but apparently they had a potential for commercial use as a part of the planned community. Because of that potential, they may have had a greater sales value than the average acreage sales value of either Calvert or Seton Belt Farms. Because of our uncertainty that the Tax Court would have found those seventy-five acres worth $4,000 in 1965 had it recognized that it should have included their value in the gain to be recognized in 1965, we think it necessary that the case be remanded to the Tax Court for resolution or clarification of that factual question.

Accordingly, we reverse the Tax Court's conclusion that Turner acquired the Calvert Farm in 1961 and held it thereafter primarily for sale in the ordinary course of business. We also hold, as the parties now agree, that Turner received the seventy-five acre Seton Belt parcel in 1965 and remand the case to the Tax Court for a determination of the value of that parcel in that year.

*REVERSED AND REMANDED.*