GUSTAV B. BIEDERMANN AND CATHERINE M. BIEDERMANN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8285–72.   Filed April 7, 1977.

*Thomas L. Hennessey,* for the petitioners.
*Marlene Gross,* for the respondent.

1

WILES, *Judge:* Respondent determined a $28,331.42 deficiency in petitioners' 1968 income taxes. The sole issue is whether Gustav B. Biedermann (hereinafter petitioner) held certain property primarily for sale to customers in the ordinary course of his trade or business when it was condemned by the State of Maryland or whether he held that property as a capital asset. If he held it as a capital asset when it was condemned, he may defer recognition of part of his gain under section 1033(a)[1] and may treat the remainder of his gain, which he chose not to defer, as long-term capital gain realized from the sale of a capital asset.

### FINDINGS OF FACT

Some facts were stipulated and are found accordingly.

Petitioner and his wife, Catherine, lived in Kingsville, Md., when they filed their 1968 income tax return with the District Director of Internal Revenue, Baltimore, Md., and when they filed their petition in this case.

On their 1968 income tax return, petitioner and his wife reported a "forced sale" on March 22, 1968, to the State of Maryland by "condemnation" of 21.359 acres of "land for development" and 9.581 acres of "land for development" for a "gross sales price" of $89,646.70. They reported interest on the condemnation award as $1,396.24. Petitioner and his wife reported the cost of the 21.359 acres as $10,679.50, the cost of the 9.581 acres as $5,000, and the expense for lawyers, witnesses, maps, and photographs as $14,761.50. In computing the taxable gain realized on the condemnation, petitioner and his wife deducted the $15,679.50 cost of the two pieces of property, the $14,761.50 expense for litigation, and a $25,000 investment in replacement property from the gross sales price of $89,646.70. The difference of $34,205.70 was not taken into income. Petitioners noted on their return that they had until December 31, 1969, to "replace" this amount.

On January 2, 1970, the Mid-Atlantic Service Center received a Form 1040 for 1968 from petitioner and his wife captioned "Amended Return," along with a remittance. On this return, petitioner and his wife reported $34,205.70 as taxable income, treating it as long-term capital gain.

---

[1] Statutory references are to the Internal Revenue Code of 1954, as amended.

Prior to April of 1952, petitioner had been in the service station business and had been a builder. After April of 1952, however, real estate development became petitioner's principal business activity. On April 21 of that year, he purchased approximately 114 acres of real estate in Baltimore County, Md., with the intention of developing it. By "real estate development," petitioner meant that he subdivided the land, cleared trees, built roads, put in storm drains, installed electricity, and then sold the improved sites to purchasers who wanted to construct homes. Petitioner did not install septic tanks or wells or build homes on the lots.

Before land could be subdivided and plats recorded, it was necessary to get the approval of a proposed subdivision from the Baltimore County Planning Commission. Accordingly, shortly after petitioner purchased the 114-acre tract, he went to Paul Dollenberg, an engineer, with a tentative plan he had proposed for the subdivision of part of the tract. Petitioner's plan included the development of 21.359 acres which were eventually taken by the State of Maryland for a park. Dollenberg revised petitioner's development plan and submitted a proposed subdivision development plan, dated May 19, 1952, to the Baltimore County authorities. On this revised plan, pursuant to petitioner's instructions, the 21.359-acre tract was merely marked "For Future Development." Petitioner wanted to develop the 21 acres at some future date if that was feasible.

After receiving approval from Baltimore County officials for the subdivision of part of the 114-acre tract, petitioner developed this part in sections. After selling portions of the first section, he created a second, a third, and then a fourth section. Plat No. 1 was recorded in October of 1952; plat No. 2 in July of 1954; plat No. 3 in July of 1954; and plat No. 4 in April of 1957. Altogether petitioner platted about 68 lots; the average size of a lot was from half an acre to three-quarters of an acre. All of the lots were sold to purchasers who wanted to build homes.

Petitioner's office was in his home, which was on the northern part of the 114-acre tract. He conducted his business under the name of "King's County." Occasionally, petitioner would advertise in a newspaper. He also had a sign in the development, on Sheradale Drive, back from the main

highway. About 50 percent of the time, prospective purchasers approached petitioner without any advertising on his part. On only one occasion did petitioner sell two lots to one person. Petitioner handled all sales himself. The buyer's attorney would search the title and handle the closing. Petitioner never paid any commissions as a seller. Petitioner reported the income on sales as ordinary income.

In 1957, petitioner filed a proposed subdivision development plan with Baltimore County authorities for the development of three lots on a portion of the 21.359 acres eventually taken by Maryland for a park. Although Baltimore County accepted petitioner's plan, he abandoned his plan and did not record these three lots.

In May of 1958, petitioner contracted to purchase 9.581 acres in Baltimore County. This property was adjacent to plat No. 3.

On June 22, 1958, petitioner saw an article in the Sunday Sun Magazine section of the Baltimore Sun entitled "Gunpowder Park?" The 114 acres of land which petitioner acquired were located near the Gunpowder River. The article in the June 22 issue of the Baltimore Sun was petitioner's first inkling that Maryland might want a portion of his land for a park.

After petitioner found out about the proposed park, he went to see the Director of Planning for Baltimore County, Malcolm Dill. Dill told him that he would not allow petitioner to develop the 21.359 acres eventually taken by Maryland. As explained above, it was necessary to receive the approval of Baltimore County authorities for a planned subdivision before plats could be recorded. Without that approval, it was impossible to subdivide land, record plats, or sell lots. From 1958 until the condemnation suit, petitioner could not develop the 21.359 acres as he had originally intended. Petitioner paved no streets, engineered no storm drains, installed no curbs or gutters, nor did he make any other improvements. When real estate taxes on the land were calculated, the land was assessed at raw acreage rates, not at developed rates.

In August of 1958, the Maryland State Planning Commission published a study for a proposed Gunpowder River Valley Park System. The record does not reveal whether petitioner was aware of this study.

On September 9, 1958, petitioner purchased the 9.581 acres, which he had contracted to purchase in May of 1958. Petitioner had originally negotiated to buy the 9.581 acres of land before 1958 to provide drainage for his other property and to develop it.

In December of 1960, the Maryland State Department of Forests and Parks received a title examination on petitioner's 114-acre tract. The record does not reveal whether petitioner was aware of this examination.

In 1961, petitioner found State appraisers on his property and showed them the property. In 1961 and 1963, summary appraisals were prepared for the Department of Forests and Parks on 21.6 acres of petitioner's 114-acre tract of land; in 1961 and 1965, summary appraisals were prepared on a 9.75-acre tract.[2] The record does not reveal whether petitioner was aware of these appraisals.

In April of 1962, the Department of Forests and Parks received a title examination on the 9.581-acre tract. The record does not reveal whether petitioner was aware of this examination.

In January of 1963, petitioner had his first formal contact with a representative of Maryland concerning the acquisition of his properties. He was contacted by James F. Miller, buyer for the Department of Forests and Parks, who made him an offer for his property. Negotiations for the acquisition of petitioner's properties lasted for more than 3½ years, from January of 1963 to August of 1966. During the negotiations, Miller came to see petitioner no more than twice since petitioner hired an attorney to negotiate with the State after Miller's initial offer. There was, however, correspondence between Miller and petitioner in regard to the acquisition by Maryland of "31 acres of property" in King's County.

In one letter to the State, petitioner's wife indicated the following:

The planners told my husband that he could not develope this land as the State Dept. of Forest & Parks wanted it. As this property is adjacent to 68 building lots that we have already sold. It is very valuable land. It is now time for us to extend our roads thru our development land. But we are told

---

[2] The record does not explain why the State of Maryland appraised 21.6 acres and 9.75 acres but eventually took only 21.359 acres and 9.581 acres.

due to a higher authority we would be prevented from developing this property, this has actually put a stigma on our property.

It is my husband's and my understanding that if a price of property is wanted, it is purchased. If the price is unreasonable it is left alone. As our price of $3000 per acre is not unreasonable, we believe that you should purchase our property or let us finish our development as the price of lots has risen to $5000 to $6000 per lot.

[Reproduced literally.]

In 1965, petitioner purchased property consisting of land and a building for $25,000. He purchased this property for rental purposes. Petitioner acquired the property because it was next to a piece of property he owned and because he believed that Maryland was going to take his development land.

On November 18, 1965, petitioner submitted a proposed subdivision development plan on the 9.581-acre tract to the Baltimore County Joint Subdivision Planning Committee as the first step toward obtaining approval for a subdivision of the property. Petitioner met the same resistance with respect to his 9.581-acre tract that he had met with respect to his 21.359-acre tract. Malcolm Dill, still Director of Planning for Baltimore County, specifically referred to the plat of Gunpowder Park exhibited on his wall when petitioner had a conference with him concerning development of his 9 acres. Petitioner submitted his plan to develop this acreage to the joint committee because he had buyers for the property and he wanted to develop it. The minutes of the joint committee's meeting of November 18, 1965, indicate certain criticisms of petitioner's plan. The joint committee proposed the extension of Ruxford Drive through the subdivision. The minutes also indicate that petitioner "was advised that after a study and overall plan has been made for the remaining area to be developed, the [petitioner's] engineer will be advised of any changes or revisions required to this plan." Sometime after petitioner submitted his plan to the committee, he revised his plan, changing the road layout to extend Ruxford Drive from the already developed and platted area through the 9.581-acre tract. Petitioner waited for the joint committee to contact him concerning the revised plan, but it never did. Petitioner never submitted his revised plan to the joint committee. Petitioner paved no streets, engineered no storm drains, nor did he install any curbs or gutters on his 9-acre tract.

Sometime before the condemnation suit was filed, petitioner cleared part of the 21.359-acre tract preparatory to the extension of King's Forest Road and Lynn Drive and cleared part of the 9.581-acre tract preparatory to the extension of Ruxford Drive. He also cleared an area in the 9.581-acre tract for a Capewood Drive in his proposed subdivision for this tract.

As explained above, negotiations between petitioner and the State of Maryland lasted from January of 1963 until August of 1966. During this period, the word "condemnation" was not used concerning the properties until the end of the negotiations, when it appeared that no agreement would be reached. By letter dated August 31, 1966, William A. Parr, then Deputy Director of the Department of Forests and Parks, made a final offer for petitioner's property advising petitioner that if the final offer were not accepted the matter would be turned over to the "State Law Department to initiate condemnation proceedings." By memorandum dated September 1, 1966, petitioner responded, advising Parr that his offer for King's County development land was $3,000 per acre.

On September 14, 1966, the Commission for Forests and Parks of the State of Maryland authorized the institution of condemnation proceedings against petitioner's property. After petitioner received notice that condemnation was authorized, he hired an attorney, Thomas L. Hennessey, to represent him in those proceedings.

On July 14, 1967, a petition for condemnation was filed against petitioner seeking to acquire 20.364 acres of the 114-acre tract and the 9.581-acre tract. On November 7, 1967, an amended petition for condemnation was filed to enlarge the description of that part of the 114-acre tract to be condemned to 21.359 acres.

In his answer to the original petition for condemnation, petitioner stated that it was unnecessary for the State to take his land.

In answers to interrogatories filed in the condemnation proceedings, petitioner claimed that the tracts sought to be condemned were an essential part of King's County and its road patterns and provided some of the best scenic lots yet to be developed. Petitioner, in his answers, listed offers to purchase parts of both tracts sought to be condemned. In

those answers, petitioner also alleged that the planning department of Baltimore County would not let him develop his land at the insistence of the condemning authority.

At the condemnation trial, petitioner told the court and jury that he was not planning to sell the land in question to the Commission of Forest and Parks. Furthermore, petitioner told the court and jury that the price he wanted from the State would be the same price that he would charge others if he decided to sell. In addition, he told the court and jury that the property being condemned by the State was his raw development acreage. He produced at trial numerous photographs depicting the entrances into his property which the State sought to condemn and the unpaved roads into these tracts. At the condemnation trial, petitioner's only expert witness testified that the highest and best use for the property would be for residential purposes and a potential subdivision; this expert defined a potential subdivision as a subdivision in the immediate future. An expert for the State who also testified at the trial agreed that both tracts of land have potential use for residential subdivision purposes. To show the highest and best use for his properties at the time of trial, petitioner drafted plats of the tracts sought to be acquired to show how the land might possibly be used.

After a jury trial of a week, petitioner was awarded $89,646.70 on December 8, 1967. The proceeds were received in March of 1968, along with $1,396.24 in interest on the judgment. In accordance with the inquisition of the jury, title to the properties was transferred to the Department of Forests and Parks of the State of Maryland.

At the time of purchase and at all times thereafter, petitioner wanted to develop both the 21.359-acre tract and the 9.581-acre tract. He was not able to do so, however, because Baltimore County authorities would not approve his subdivision plans.

OPINION

Petitioner realized gain from the condemnation of two pieces of unimproved real estate. Petitioner wants to defer recognition of part of his gain under section 1033[3] and to treat

---

[3] SEC. 1033. INVOLUNTARY CONVERSIONS. ·
(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part,

the remainder of his gain, which he chooses not to defer, as long-term capital gain realized from the sale of a capital asset. Respondent argues that section 1033 is inapplicable to petitioner's case and that petitioner may not defer recognition of any part of his gain. Respondent also argues that all recognized gain should be taxed as ordinary income.

Petitioner bases his argument, that he may defer part of his gain, upon section 1033(a) and section 1033(g). Section 1033(a)(3) provides that a taxpayer who receives money from the conversion of condemned property may defer gain

---

theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

(1) CONVERSION INTO SIMILAR PROPERTY.—Into property similar or related in service or use to the property so converted, no gain shall be recognized.

* * *

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. * * *

* * *

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.

* * *

(g) CONDEMNATION OF REAL PROPERTY HELD FOR PRODUCTIVE USE IN TRADE OR BUSINESS OR FOR INVESTMENT.—

(1) SPECIAL RULE.—For purposes of subsection (a), if real property (not including stock in trade or other property held primarily for sale) held for productive use in trade or business or for investment is (as the result of its seizure, requisition, or condemnation, or threat or imminence thereof) compulsorily or involuntarily converted, property of a like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted.

provided that he replaces the condemned property with property "similar or related in service or use." In this case, petitioner replaced unimproved real estate with improved real estate. Section 1.1033(a)–2(c)(9)(i), Income Tax Regs., states that "There is no investment in property similar in character and devoted to a similar use if * * * [t]he proceeds of unimproved real estate, taken upon condemnation proceedings, are invested in improved real estate." If we were to look no further, section 1033(a)(3) would be inapplicable in light of this regulation.

Section 1033(g)(1) provides, however, that:

*For purposes of subsection (a), if real property (not including stock in trade or other property held primarily for sale)* held for productive use in trade or business or for investment is (as the result of its seizure, requisition, or condemnation, or threat or imminence thereof) compulsorily or involuntarily converted, property of a *like kind* to be held either for productive use in trade or business or for investment *shall be treated as property similar or related in service or use to the property so converted.* [Emphasis added.]

Section 1.1033(g)–1, Income Tax Regs., states that section 1.1031(a)–1(b) provides principles for determining whether the replacement property is property of "like kind." Section 1.1031(a)–1(b), Income Tax Regs., provides that the words "like kind" have reference to the nature or character of the property and not to its grade or quality; the fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. Respondent concedes that if section 1033(g) is applicable, then section 1033(a) is applicable and petitioner would be entitled to defer recognition of that part of the amount realized which he invested in improved real estate. Respondent notes, however, that section 1033(g) does not apply to "stock in trade or other property held primarily for sale"; respondent contends that this is precisely the type of property converted. The question, then, is very clear: Was the condemned property stock in trade or other property held primarily for sale? If it was, then petitioner may not defer recognition of gain.

Petitioner wants to treat the remainder of his gain, that portion which he chooses not to defer but to recognize, as long-term capital gain realized from the sale or exchange of a capital asset. To do this, he must establish that the gain arose

from the sale or exchange of a capital asset held for more than 6 months. Condemnation is certainly a sale, *Hawaiian Gas Products, Ltd. v. Commissioner,* 43 B.T.A. 655 (1941), affd. 126 F.2d 4 (9th Cir. 1942), cert. denied 317 U.S. 653 (1942), and the properties involved herein were certainly held for more than 6 months.

Section 1221(1) provides, however, that

> For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
>> (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

Thus the question here is the same one that we must answer in deciding whether petitioner may defer a portion of his realized gain: Was the condemned property stock in trade or other property held primarily for sale?

Generally this Court will consider a number of factors in deciding whether a particular asset is held primarily for sale or is a capital asset. In the Court of Appeals for the Fourth Circuit, the circuit to which this case is appealable, the ultimate conclusion, i.e., whether a particular asset is held primarily for sale or is a capital asset, is a question of law. The resolution of subordinate facts (which lead to that ultimate conclusion) will remain subject to the clearly erroneous rule. *Turner v. Commissioner,* 540 F.2d 1249 (4th Cir. 1976). The purpose for which a particular asset is held may change from time to time. Therefore it is important to recognize that it is the purpose for which property is held *at the time of sale* that determines tax treatment. *Eline Realty Co. v. Commissioner,* 35 T.C. 1 (1960). While this purpose is determinative, we may look at earlier events to determine precisely what the purpose was at time of sale. *Maddux Construction Co. v. Commissioner,* 54 T.C. 1278 (1970).

On the facts before us, it is clear that when petitioner transferred 21.359 acres and 9.581 acres to Maryland, because the acreage had been condemned, he was holding the two pieces of property as capital assets.

Real estate development became petitioner's principal business in 1952 when he purchased 114 acres for develop-

ment. By "real estate development," petitioner meant that he subdivided the land, cleared trees, built roads, put in storm drains, installed electricity, and then sold the improved sites to purchasers who wanted to construct homes. Between 1952 and 1957, petitioner was very successful. He recorded four plats which contained about 68 lots; the average size of a lot was from half an acre to three-quarters of an acre. All of the lots were sold. In fact, petitioner was so successful that about 50 percent of the time prospective purchasers approached petitioner without any advertising on his part.

In June of 1958, petitioner saw an article in the Sunday Sun Magazine section of the Baltimore Sun entitled "Gunpowder Park?" Petitioner's 114 acres were located near the Gunpowder River. This article was petitioner's first "inkling" that Maryland might want a portion of his land for a park.

After petitioner found out about the proposed park, he went to see Malcolm Dill, the Director of Planning for Baltimore County. Petitioner's land was in Baltimore County. Dill told petitioner that he would not allow petitioner to develop the 21.359 acres which were eventually taken by Maryland for a park. It was necessary to receive approval from Baltimore County officials[4] for a planned subdivision. Without that approval, it was impossible to subdivide land, record plats, or sell lots. As stated above, section 1221(1) provides that a "capital asset" is property held by a taxpayer but does not include stock in trade or other property held primarily for sale. Since petitioner's business was to sell improved land and since Baltimore County officials would not allow petitioner to improve his 21-acre tract, he held this acreage as a capital asset from the time those officials refused to approve development. Although petitioner had improved about 68 sites from 1952 to 1958, he improved no sites on the 21 acres after Malcolm Dill told him that he would not allow it. He paved no streets, engineered no storm drains, installed no

---

[4] The precise relationship between (1) Malcolm Dill, who, as noted above, was Director of Planning for Baltimore County, (2) the Baltimore County Planning Commission, which approved some of petitioner's earlier subdivision plans, and (3) the Baltimore County Joint Subdivision Planning Committee, which did not approve petitioner's plan for the subdivision of his 9-acre tract, is not entirely clear from the record. It is clear, however, that Baltimore County officials could, and did, block petitioner's development of his land.

curbs or gutters, nor did he make any other improvements. When real estate taxes on the land were calculated, the land was assessed at raw acreage rates, not at developed rates.

In 1958, petitioner purchased 9.581 acres, the second piece of property eventually condemned by Maryland. He had no more success in developing this piece of property than he did his 21-acre tract. On November 18, 1965, petitioner submitted a proposed subdivision development plan on the 9.581-acre tract to the Baltimore County Joint Subdivision Planning Committee as the first step toward obtaining approval for a subdivision of the property. Malcolm Dill, still Director of Planning for Baltimore County, referred to the plat of Gunpowder Park exhibited on his wall when petitioner had a conference with Dill concerning development of his 9 acres. The joint committee criticized petitioner's plan, proposing the extension of Ruxford Drive through the subdivision. The minutes of the joint committee's meeting indicate that petitioner's engineer would be advised of any change or revisions required of petitioner's plan. Sometime after petitioner submitted his plan to the committee, he revised his plan, changing the road layout to extend Ruxford Drive from the already developed and platted area through the 9.581-acre tract. Petitioner was waiting for the joint committee to contact him, but it never did. As he testified, "they ignored the whole thing." Petitioner paved no streets, engineered no storm drains, nor did he install any curbs or gutters on his 9-acre tract. As with the 21.359-acre tract, petitioner held the 9.581-acre tract as a capital asset from the time officials of Baltimore County would not allow him to develop it because of the proposed park.

Petitioner's testimony concerning resistance of Baltimore County officials to development is supported by a letter that his wife sent to the State. In that letter she said:

*The planners told my husband that he could not develope this land as the State Dept. of Forest & Parks wanted it.* As this property is adjacent to 68 building lots that we have already sold. It is very valuable land. It is now time for us to extend our roads thru our development land. *But we are told due to a higher authority we would be prevented from developing this property, this has actually put a stigma on our property.*

It is my husband's and my understanding that if a price of property is wanted, it is purchased. If the price is unreasonable it is left alone. As our price of $3000 per acre is not unreasonable, we believe that you should

purchase our property or let us finish our development as the price of lots has risen to $5000 to $6000 per lot.
  [Reproduced literally. Emphasis added.]

Perhaps the most dramatic support given to petitioner's testimony is the stark contrast between petitioner's development activities before 1958 and those after. Between 1952 and 1958, petitioner recorded four plats and improved 68 lots. After 1958, when he first found out about the proposed park, until 1968, when he transferred the land in question to Maryland, he did not develop the land at all.

It is true that petitioner cleared part of the 21-acre tract and part of the 9-acre tract preparatory to the extension of roads. This does not affect our holding. There is nothing wrong with a prudent businessman maintaining his options in case the State would change its mind. It is equally true that petitioner opposed condemnation and would have developed his property had it not been for condemnation. But this fact does not affect our holding either. Whatever petitioner may have wanted to do if he had the opportunity, it is clear that Baltimore County officials simply would not let him develop his land. Both pieces of property were held as capital assets at the time of condemnation and sale to the State.

In *Tri-S Corp. v. Commissioner*, 48 T.C. 316 (1967), affd. on other grounds 400 F.2d 862 (10th Cir. 1968), *Ridgewood Land Co. v. Commissioner*, T.C. Memo. 1972–16, affd. 477 F.2d 135 (5th Cir. 1973), and *Juleo, Inc. v. Commissioner*, T.C. Memo. 1971–68, revd. 483 F.2d 47 (3d Cir. 1973), we held that a *condemnation notice* changed land held primarily for sale to customers in the ordinary course of business into a capital asset. These cases are distinguishable. In the case before us, the assets were capital assets at least from the time Baltimore County officials refused petitioner the right to develop his land.[5] Baltimore County officials refused petitioner the right to develop his 21-acre tract from around 1958 and refused him

---

  [5] In this case, we have found that the condemned properties were capital assets from the time Baltimore County officials refused petitioner the right to develop them. It may well be that the condemned properties were also capital assets from the time of purchase until Baltimore County officials refused petitioner the right to develop them. Throughout the entire period that petitioner held the properties, they were *undeveloped*. He was in the business of selling *developed* land to purchasers who wanted to build homes.

the right to develop his 9-acre tract from 1965. Their refusal to allow petitioner to develop his land occurred long *before* *threat* of condemnation or *notice* of condemnation. See *Fabiani v. Commissioner*, T.C. Memo. 1973-203.[6] It is clear that the State of Maryland did not threaten condemnation until August of 1966, when negotiations with petitioner failed to produce agreement. The Commission for Forests and Parks authorized the institution of condemnation proceedings on September 14, 1966. Obviously September 14, 1966, was the earliest date that petitioner could have received *notice* of condemnation.

Although we have held for petitioner, petitioner agrees that he miscalculated the amount of tax owing on the gain that he chose not to defer. Therefore,

*Decision will be entered under Rule 155.*

---

[6] In *Fabiani* we stated the following:

"Since we have found that prior to receiving the condemnation notice petitioners held the Hop Brook property as an investment, it is unnecessary for us to consider whether receipt of a condemnation notice can change the reason for which property is held. Accordingly, we decline to accept respondent's invitation to reconsider our decisions in *Tri-S Corp., Ridgewood Land Co., Inc.* and *Juleo, Inc.*"

We want to expand upon that statement. Respondent is eager to have us reverse the position we took in *Tri-S Corp.* and its progeny. This is understandable since it is clear from respondent's brief in this case that he thinks *Tri-S Corp.* is wholly incorrect. However, before we can even consider the question presented by *Tri-S Corp.*, we must have the necessary factual framework. We did not have it in *Fabiani*, and we do not have it here. Cases such as *Fabiani* and this case merely add unnecessarily to the already heavy caseload of this Court. When respondent finds a case with a factual framework like that in *Tri-S Corp.*, we will reconsider our decision in *Tri-S Corp.*, but not before.