ALBERT W. TURNER and THERESE L. TURNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Turner v. Commissioner
Docket No. 1904-70.
United States Tax Court
T.C. Memo 1977-437; 1977 Tax Ct. Memo LEXIS 4; 36 T.C.M. (CCH) 1790; T.C.M. (RIA) 770437; December 28, 1977, Filed John S. Nolan,Wallace E. Whitmore, and F. Brook Voght, for the petitioners. Thomas C. Morrison, for the respondent. TANNENWALD
SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: In our opinion filed October 9, 1974 (T.C. Memo. 1974-264), this Court held, inter alia, that petitioner Albert W. Turner (hereinafter Turner) held certain property (hereinafter Calvert tract) primarily for sale in the ordinary course of business and that gain realized on the disposition of such property was properly taxable as ordinary income. The United States Court of Appeals for the Fourth Circuit *5 reversed the Tax Court (540 F.2d 1249 (1976)), concluding that the Calvert tract was held for investment purposes, and that profit on the sale therefrom should be treated as capital gain. It also held that Turner received in 1965 a certain 75-acre tract as part of the consideration for his transfer of the Calvert tract and remanded the case for a determination of the value of that acreage. [1] Many of the pertinent findings of fact are set forth in our prior opinion and are incorporated herein by this reference. Such facts are reiterated and supplemented herein only to the extent necessary to an understanding of the valuation issue which we are called upon to resolve. *6 That issue also involves the eligibility of petitioners to report Turner's gain from the sale of the Calvert tract on the installment basis under section 453. [2] In this respect, respondent has filed a claim for an increased deficiency and has the burden of proof. Rule 142(a), Rules of Practice and Procedure of this Court. FINDINGS OF FACT On June 5, 1961, Turner purchased the Calvert tract, consisting of 476.4245 acres of farmland in Largo, Prince Georges County, Maryland, for $524,066.95, or $1,100 per acre. During the period in which Turner was negotiating to purchase the Calvert tract, he was also inquiring as to the availability of property adjacent thereto known as the Belt tract. This tract was held in trust by the Mercantile Safe-Deposit and Trust Company (Mercantile). Mercantile received several unsolicited offers to purchase the Belt tract and another adjacent tract (the Chelsea tract) held by it in trust. Because of its belief that the properties would appreciate in value and the fact that rental of the properties for farming purposes *7 produced sufficient revenue to pay property taxes, Mercantile decided to retain the properties for investment purposes. In 1962, the Maryland National Capital Park and Planning Commission purchased a 437-acre tract from Mercantile for $1,545 per acre (including all of the Chelsea tract and a few acres from the Belt tract). Sometime toward the end of 1964 or early 1965, Mercantile decided to sell the remainder of the Belt tract by means of a sealed bid auction. As part of an extensive publicity campaign, notices describing the sale were placed in such newspapers as the New York Times, Wall Street Journal, Baltimore Sun, Philadelphia Inquirer, and Washington Post, and a written prospectus was mailed directly to more than 1,200 prospective bidders. Shortly before the final date for submitting bids, Turner learned that the county sewer commission of Prince Georges County was planning to authorize an extension of water and sewer lines into the area of the Calvert and Belt tracts; such extension was approved by the commission on September 22, 1966. The bids were opened on April 26, 1965. Seven parties tendered sealed bids for the Belt tract, ranging from $755 to $4,550 per acre. *8 Turner's bid of $2,615,188.49, or $4,550 per acre (which he tendered as president of MCD, a corporation engaged in the business of residential construction and of which Turner was one of the two stockholders) was accepted. At that time, Turner was prepared to have a further and higher ($5,000 per acre) bid on behalf of MCD if necessary to obtain the property. Subsequent to MCD's successful bid, Turner and Kilby (the other stockholder of MCD) concluded that the Belt and Calvert tracts should be combined for development purposes.They felt that a larger development, including apartments, townhouses, single family homes, and commercial construction, would be more likely to secure approval of the Prince Georges County Planning Commission than would separate plans for each tract. Turner indicated that he would convey the Calvert tract to MCD if, in partial consideration of such a transfer, MCD would obtain commercial zoning for a 75-acre portion of the Belt tract and convey the same to him. By contract dated October 4, 1965, Turner and MCD executed their final agreement of sale for the Calvert tract, pursuant to which MCD agreed to purchase the Calvert tract from Turner for $4,000 *9 per acre, or an aggregate of $1,905,698, payable as follows: (a) $10,000 in cash; (b) the assumption of two mortgages aggregating $443,552; (c) a promissory note of $1,152,146; and (d) 75 acres from the combined tract after the rezoning, which MCD agreed to endeavor to obtain. To the extent of certain shortfalls in the anticipated zoning, which would cause Turner not to receive the full 75 acres, he was to be compensated for the reduction at the rate of $4,000 per acre.[3]
MCD applied for the zoning changes necessary to permit development of the planned community, including 75 acres zoned for commercial use. The rezoning was approved on August 23, 1967. Pursuant to the October 4, 1965, contract, MCD conveyed a 75-acre portion of the Belt tract to Turner on October 13, 1967. [4] This tract was zoned as follows: Zoning Clas-
Number of sification
Acres
Permitted Uses
C-1
14.10
Restricted commercial
C-2
35.48
Unrestricted commercial
RH
8.71
Residental high-rise
apartments
R-80
4.22
Residential single family
homes - approx. 1/3 acre
lots
Streets
12.49
*10 Of the 1,239 acres rezoned, [5] the 75 acres conveyed to Turner included the only land zoned C-2 and 38.9 percent of the land zoned C-1. The Belt, Calvert, and Chelsea tracts are contiguous properties located between Central Ave. and Maryland Route 202, and to the east of the intersection of these thoroughfares. The Belt tract is roughly triangular in shape with frontage of about 6,330 feet on Central Ave. and of about 5,380 feet on Route 202. Of the Belt, Calvert, and Chelsea tracts, the Belt tract is closest to the intersection of Route 202 and Central Ave. The Calvert tract lies to the east of the Belt tract, with less frontage on Central Ave. than the Belt tract and no frontage along Route 202. The Chelsea tract was located to the east of the Belt tract, and to the south and west of the Calvert tract. It had no frontage along Central Ave. *11 or Route 202. Central Ave. and Route 202 (Largo Road) intersect at a distance of approximately one-half mile from the Central Ave. exit of the Washington Beltway and approximately 1 mile from the Landover Road exit of the Beltway. The 75 acres conveyed to Turner is located approximately 1/4 mile east of the Central Ave. - Route 202 intersection and is the portion of the Belt tract situated closest to this intersection. During the years 1959-1968, there were 16 sales of property having varying degrees of relevancy in determining the value of the Calvert tract in 1965. The date of each sale, the size of the property, and the price per acre are as follows: Sale No.
Date
Acres
Price Per Acre
1
3/ 6/58
19.66
$ 3,408
2
6/26/59
65.00
4,122
3
8/21/59
65.81
5,372
4
3/15/60
10.00
5,000
5
5/16/60
10.00
6,250
6
9/16/60
35.25
7,092
7
2/ 9/62
66.54
3,350
8
5/ 6/63
23.46
3,002
9
5/11/64
47.13
3,500
10
11/ 4/64
60.17
4,222
11
12/22/64
19.19
5,210
12
2/24/65
93.22
3,700
13
7/27/66
187.77
3,750
14
11/22/66
574.77
4,550
15
1968
363.36
3,507
16
1968
105.47
3,011
Sale No. 14 is the purchase of the Belt tract *12 by MCD.The Belt tract was more valuable than the Calvert tract because of its better grades and elevation and its frontage along Route 202 as well as Central Ave. Sales 1, 4, 5, and 6 involved properties which had frontage along Central Ave. Of the properties included in the list of sales, these were the properties situated closest to Turner's 75-acre tract. These properties were located closer to the Beltway than Turner's tract, and the property involved in sale 1 also had frontage on Route 202. [6] If land is zoned for residential use, the value of the land varies directly with the permitted density, i.e., property zoned RR, which permitted less than 2 lots per acre, was worth less than property zoned R-80, which permitted approximately 3 lots per acre. The relative value of property zoned for residential use, in decreasing order of value according to its zoning, was RH, R-18, RT, R-80, and RR. Land zoned RH was not quite as valuable as land zoned C-1, the more restrictive zoning classification which permitted commercial use. Land zoned C-2, the less restrictive commercial classification, is somewhat more valuable than land zoned C-1. *13 On March 22, 1968, MCD sold.913 acre out of the Belt tract to the local fire department for $40,000.
ULTIMATE FINDING OF FACT The fair market value of the 75 acres received by Turner from MCD in 1965 was $8,000 per acre. OPINION Apparently because a valuation of the 75 acres in question in excess of $8,985 per acre would result in petitioners receiving more than 30 percent of the selling price of the Calvert tract in 1965 and thereby preclude them from taking advantage of the installment method of reporting, the parties were unable to arrive at a mutually agreeable figure through settlement negotiations -- a "process clearly more conducive to the proper disposition" of this kind of a dispute. [7] See Messing v. Commissioner,48 T.C. 502, 512 (1967). The result is that we are required to confront a factual issue that is "inherently imprecise and capable of resolution only by a Solomon-like pronouncement." Messing v. Commissioner,supra at 512. *14 We see no reason to set forth in detail each of the factors, such as the size of the tract, its location and topography, zoning probabilities and the differing values attaching to various types thereof, the likelihood of water and sewer connections being available, and other sales of property having varying degrees of comparability, which we have taken into account in arriving at our ultimate finding of a value of $8,000 per acre -- a figure which is substantially closer to the $4,000-per-acre figure asserted by petitioners than the $35,000-per-acre figure contended for by respondent. Our finding is based upon our evaluation of the record as a whole and without regard to the location of the burden of proof. A few observations are in order, however. At the time Turner received the 75 acres for tax purposes in 1965, he had a commitment from MCD to seek high density rezoning for that acreage. Because of MCD's ability to submit a rezoning plan encompassing more than 1,000 acres, the likelihood that high density zoning would be approved for the 75 acres Turner was to receive was very high. We think that petitioners' expert witnesses gave too little weight to this factor and that, *15 on the other hand, respondent's expert witness overemphasized this factor by a wide margin. [8] See Knoell v. United States,236 F. Supp. 299, 301 (W.D. Pa. 1964). [9]
On this basis, we are also of the opinion that the $4,000-per-acre price tag for any reduction in the number of acres to be conveyed to Turner should not be considered a definitive measure of value. Many of the sales upon which petitioners rely were properties included in an appraisal of the Calvert tract. As far as can be discerned from the record, none of these properties were zoned to permit high density uses. [10] Property zoned for high density use sells at a considerable premium compared to property without such advantageous zoning. In addition, factors making property valuable for commercial purposes may have very different effects on property to be used for residential purposes.Accordingly the comparability of such sales to the 75 acres is *16 substantially lessened. To the extent that such sales are relevant, they indicate that property located closer to the Beltway tended to be more valuable than more remote property and that value depended, to some degree, on whether and the extent to which a particular property fronted on one or more major thoroughfares. The most comparable sale seems to us to have been the purchase of the entire Belt tract by MCD in November 1966 for $4,550 per acre, although we have concluded on the basis of the entire record herein that such price is not determinative. Certainly, petitioners have not indicated any basis for concluding that the portion of the Belt tract conveyed to Turner was less valuable, on the average, than the remainder of the tract. They argue that the presence of substantially lower bids placed on the Belt tract indicates a fair market value of a lesser amount for the entire tract.However, the lower bids might indicate a variety of other factors, including the probability that other bidders were not aware *17 that an extension of water and sewer lines had been planned shortly before the bids were due. [11]
Under the October 1965 agreement, Turner was to receive 75 acres of land "zoned for apartments, town houses and/or commercial development." The tract which Turner in fact received had 4.22 acres zoned R-80 and 12.49 zoned for streets. Given his rights under the October 1965 agreement and the fact that he controlled MCD's policies and operation, we conclude that Turner accepted the 75 acres because they were at least as valuable as any other portion of the Belt tract. Moreover, we should not overlook the fact that the acreage in question was favorably situated in terms of enabling Turner to take advantage of the expanding development of the area in which it was located. [12]
*18 Respondent's witness testified that the 75-acre tract would have been worth 80" per square foot (or slightly less than $35,000 per acre) if it had been purchased subject to the condition that commercial zoning be obtained. His testimony was largely ex cathedra and devoid of any real foundation in the record. The only commercial sales which he classified as comparable were located at some considerable distance from the Belt tract, and there is no evidence indicating that the properties were comparable in size, location, and terrain. [13]
Respondent also argues that MCD's sale in 1968 of less than one acre of the Belt tract to the fire department for $40,000 demonstrates the correctness of his valuation. Although this sale should be given some weight in our calculation, the acreage involved is too small and the sale is too remote in time for this transaction to be considered as a strictly comparable sale. Decision will be entered under Rule 155. Footnotes
1. The full text of the remand is as follows (540 F. 2d at 1253): For the purpose of its installment sales calculations, the Tax Court assigned a value of $4,000 per acre to the seventy-five acres assigned to Turner from Seton Belt Farm. The parties had tentatively assigned the same value to those acres in the event of a commercial zoning underfall. The Tax Court, however, made no express finding as to their actual value as a part of the consideration paid to Turner. In 1965 they had not been rezoned for commercial use, but apparently they had a potential for commercial use as a part of the planned community. Because of that potential, they may have had a greater sales value than the average acreage sales value of either Calvert or Seton Belt Farms. Because of our uncertainty that the Tax Court would have found those seventy-five acres worth $4,000 in 1965 had it recognized that it should have included their value in the gain to be recognized in 1965, we think it necessary that the case be remanded to the Tax Court for resolution or clarification of that factual question. * * *
We * * * remand the case to the Tax Court for a determination of the value of that parcel in that year.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
3. The pertinent provisions of the agreement are set forth verbatim in the findings of fact contained in our prior opinion.↩
4. By agreement of the parties and the opinion of the Fourth Circuit, Turner is deemed to have received this acreage for tax purposes in 1965. See 540 F. 2d at 1253↩. 5. This consisted of the Belt and Calvert tracts, as well as an 187-acre parcel known as the Smith tract which was purchased by MCD on July 27, 1966.↩
6. At the time of sale 4, the property involved did not front on Route 202. However, at that time, there was general knowledge that Route 202 would be relocated in such a manner as to provide this parcel with frontage on that road.↩
7. Despite the shifting positions of the parties, particularly those of respondent, during the extended course of litigation herein, there no longer appears to be any dispute that the transaction between Turner and MCD should be treated as a section 1031 exchange with boot, in an agreed amount of $1,605,698, to which Section 453 can apply. See Rev. Rul. 65-155, 1965-1 C.B. 356↩.
8. Indeed, the $35,000-per-acre figure advanced by respondent's expert was specifically qualified as being "subject to commercial zoning." ↩
9. See also Estate of Wolfe v. Commissioner,↩ a Memorandum Opinion of this Court dated Jan. 15, 1954.
10. The only sale which may have involved commercially zoned property was sale 1, which had been used as a vegetable and fruit stand at the time of sale in 1958.↩
11. Apparently, the fact that sewer lines were to be extended to the vicinity of the Belt tract was not common knowledge as of April 26, 1965. Such information would tend to raise property values in the area that could be served by the sewer lines. Based on such knowledge, Turner was prepared to bid $5,000 per acre for the Belt tract.↩
12. See Estate of Wilson v. Commissioner,T.C. Memo. 1964-17↩.
13. One of the two properties which he termed comparable was approximately two acres in size.↩