J. Stewart MATHEWS and Viola I. Mathews, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

J. Stewart MATHEWS, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 14835–14836.

United States Court of Appeals
Sixth Circuit.

March 22, 1963.

Eugene P. Ruehlmann, Cincinnati, Ohio (Strauss, Troy & Ruehlmann, Eugene P. Ruehlmann, Kenneth D. Troy, Lucien G. Strauss, Cincinnati, Ohio, on the brief), for petitioners.

Michael K. Cavanaugh, Department of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Michael K. Cavanaugh, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before McALLISTER, Senior Circuit Judge, WEICK, Circuit Judge, and BOYD, District Judge.

McALLISTER, Senior Circuit Judge.

This is a consolidated appeal from the decision of the Tax Court holding petitioner, Dr. J. Stewart Mathews, liable for income taxes for the taxable year of 1956, and holding petitioners, Dr. Mathews and his wife, liable for income taxes for the taxable year of 1955.

The ground upon which the Tax Court based its decision was that the income taxed was not capital gain resulting from the sales of capital assets, but ordinary income, since it resulted from the sale of property "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." [1] Dr. Mathews will hereafter be referred to as the taxpayer, his wife being joined solely because she filed a joint return with him in 1955.

The taxpayer's income from real estate sales, the practice of medicine, and miscellaneous sources, including rentals and sales of mineral rights, during the two taxable years, was as follows:

| Year | Sale of Real Estate | Practice of Medicine | Miscellaneous |
|------|------|------|------|
| 1955 | $ 72,306.05 | $29,701.39 | $13,711.49 |
| 1956 | 284,406.24 | 33,433.23 | 14,998.47 |

The claim of the taxpayer is that the sales of the property in question were sales of capital assets; and the sole issue in the case is whether the income received therefrom was from sales of capital assets or was ordinary income.

In his contention that the property sold was not property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, but rather constituted sales of capital assets, Dr. Mathews submits that he never was engaged in the trade or business of selling property and, accordingly, that he could not have held the property here in question for sale "to customers in the ordinary course of his trade or business."

We proceed, first, to consider the claims and evidence of the taxpayer that the proceeds of the sales of the real estate in question were capital gains and not ordinary income.

In support of his disclaimer that he held the property for sale to customers in the ordinary course of his trade or business, counsel for the taxpayer submitted proof that he was not in the business of holding and selling property to customers, by reason of the following uncontradicted evidence: Taxpayer testified that he is a practicing physician in Wyoming, Ohio, a city just outside Cincinnati, and he has been a full-time general practitioner since 1925. He is associated with nine other physicians in the general practice of medicine, being the senior partner of the group, and is also a member of the staff of five leading hospitals in the Cincinnati area. He is at his office at approximately eight o'clock in the morn-

1. The applicable section of the statute in Section 1221 of the Internal Revenue Code of 1954 (26 U.S.C., 1958 ed., Sec. 1221), which provides:
"*Capital asset defined*
"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

ing, and does not finish his professional activities until long past the supper hour, and many of his evening hours are occupied at his office or on house calls. In addition to his medical practice, he is performing, and has performed, many outstanding services to his community, among which the most prominent are the following: He is a member of the Academy of Medicine and is one of its past presidents. He regularly attends the meetings of the Academy and serves on several committees. For approximately twenty years he has served on the Hamilton County, Ohio, Board of Health and has been president of the Board for approximately twelve years. For more than ten years he has been a member of the Public Health Federation and for two years, was president of this organization. He is a member of the Board of Directors of the Anti-Tuberculosis League and was chairman of its Medical Advisory Committee, as well as being chairman of the Medical Advisory Committee of the Polio Foundation of Hamilton County. He is also a member of the Board of Directors of the Southwestern Ohio Blue Cross and Blue Shield organizations, and has served on the Board of Directors of the Community Chest. At the present time he is a member of the Executive Committee of the Greater Cincinnati Hospital Fund. During all the time he has rendered these services to the community, Dr. Mathews has received no compensation therefrom, all having been rendered gratuitously. From the foregoing it is submitted that Dr. Mathews practices his profession full time; that such full-time practice of his profession is his business; and that he does not, and did not, hold property primarily for sale in the ordinary course of his trade or business.

It is further submitted by the taxpayer that he has never been a real estate dealer; has never had a broker's or salesman's license, nor maintained a sales office; has never advertised his property for sale, nor placed "For Sale" signs thereon. It further appears that he never subdivided, improved, nor developed any acreage. He emphatically declared that all of the real estate transactions into which he entered were for investment, and not for sale in the ordinary course of business.

As to the actual purchases and sales of the property in question, it appears that the taxpayer became familiar with real estate outside Ohio, as a result of his vacations in Florida. Since 1926, he has taken vacations there several times a year. In 1954, he made his first trip to California, while his daughter was teaching in that state.

During the years 1951 through 1959, taxpayer purchased seventy-four properties in Florida and California. These purchases were made in his individual capacity, in joint ventures with other persons, or as a member of, or trustee for, various syndicates. The above-mentioned properties included individual lots, blocks of lots, and tracts of land, ranging from five acres to forty-two hundred acres. The land, so purchased, was located in eight counties in Florida and in three counties in California. The taxpayer organized thirteen syndicates, from the years 1952 through 1959, and served as trustee and manager in each of the syndicates. When he had insufficient funds to make a purchase of property in his own name, he would make a cash deposit and contact other parties, who had previously indicated an interest, for the purpose of forming a syndicate to purchase the land. The taxpayer also engaged in thirteen joint ventures for the purchase and sale of such land. As sole trustee for the syndicates, the taxpayer looked after the maintenance of the properties, handled rental or income arrangements, personally executed documents and arranged the details with respect to the purchases and sales of properties, and rendered accounting and annual statements to the members, with respect to syndicate operations. The taxpayer exercised similar managerial functions with respect to the joint ventures.

From the years 1953 through 1957, the properties, purchased by taxpayer, showed great increases in value, because

of a land boom in southern Florida. Taxpayer listed many properties for sale, either with brokers exclusively, or through a real estate listing bureau, although he did not personally advertise them for sale. He provided brokers with information concerning properties he had for sale, and negotiated with purchasers whom the brokers located.

Much of the foregoing, respondent Commissioner contends, shows that the taxpayer was buying and holding the land in question primarily for sale to customers in the ordinary course of business. Moreover, in support of this claim, the Commissioner emphasizes that the taxpayer engaged in extensive correspondence with real estate brokers and others regarding various aspects of the purchase and sale of his real estate; that in 1953, the taxpayer wrote to a real estate broker about one tract of land, saying: "We can hold it for a long pull if necessary, but if there is any [good offer] coming down that way we might as well grab it." Further, it is emphasized that on December 8, 1953, the taxpayer listed two lots for sale with Real Estate Listing Bureau, Inc., of Delray Beach, Florida; that in May, 1954, he notified a real estate broker that he had removed a property from the Listing Bureau, and had given the broker an exclusive listing, "so that you may feel justified in erecting a sign on the property"; that on May 1, 1954, the taxpayer contacted a real estate subdivider offering certain property for sale; that on September 2, 1955, the taxpayer wrote a real estate broker in Florida that "It would be alright to arrange for closing the deal on the 10 acre tract on Military Trail which you sold some months ago, but which I did not want closed until after Sept. 25th, because it will not be six months until the 25th"; that, on the same day, he wrote to another broker asking: "What do you think is wrong with the lot on MacFarlane Ave.? It seems to me it should move"; that on September 9, 1955, the taxpayer listed two separate tracts of land with another broker; that in July, 1956, taxpayer wrote a real estate broker in San Clemente, California, offering for sale several properties in San Clemente, which he had purchased in May 1954 and 1955.

It appears that the services of an accountant were required to assist the taxpayer in maintaining his books and records with regard to his properties and in preparation of annual reports to the members of the various syndicates; that the taxpayer had substantially all of his money tied up in real estate; that he frequently financed his purchases of real estate by small down payments and large mortgages; that, upon occasion, he found it necessary to sell properties in order to meet payments due on others, or to purchase new ones.

Respondent Commissioner, in conclusion, emphasizes that the taxpayer, in his various capacities, purchased sixteen properties in 1955, and fifteen in 1956, the taxable years in question; that he sold, in his various capacities, sixteen properties in 1955 after holding them an average period of one year, nine and one-half months; and that he sold seventeen properties in 1956 after holding them an average period of one year, ten and one-half months. The Florida and California properties were all acquired in 1951 and in subsequent years.

On behalf of the taxpayer, it is to be said that the evidence discloses that, while he is one of the leading physicians in Cincinnati, he has been devoted to gardening, horticulture, and farming since he was a small boy, and owned a horticultural nursery even before he went to medical school. He has at all times, since the beginning of his medical practice, owned one or two farms, and has had several farming operations in Ohio, where he has raised beef cattle, and conducted feeding and dairy operations, as well as raising corn, wheat, and alfalfa. Long before this controversy arose, the taxpayer had engaged in the practice of buying dilapidated, old farms, rebuilding the fences and barns, as well as the house and other structures, placing in operation wells and electricity and then reselling them after years of actual

tilling of the soil under his personal direction. His chief recreation is working on a farm where he often carries on as a farm laborer; trims and grafts trees; sprays, fertilizes, and does other similar farm work as a form of relaxation.

The taxpayer's claim is that many of of his purchases in Florida were made with the idea of acquiring farm lands for investment, and that he purchased land both in Florida and in California as homesites for himself.

Petitioner urges, in support of his contention, that the properties in question were held for investment rather than for sale in the ordinary course of business, that the location and the very nature of the lands which he purchased show that they were bought for investment. As an instance, the testimony and one of the unquestioned exhibits in the case show that parcels of land, purchased by petitioner and designated by numbers 2, 3, 4, 6, 7 and 8 were just west of Delray Beach, and parcel number 12 was a few miles north, and that they all were in a small area which would permit of their being farmed by one owner. Parcel number 2 consisted of sixty acres of "wild farm land," with fences, but "almost as nature left it." Parcel number 12 consisted of one-hundred fifty acres of farm land. Petitioner stated that when he returned to Florida six months after some of these purchases, he found subdivisions on both sides of the property, and the next year his tax bills went from $200 a year to almost $2,000 a year. Accordingly, he stated, he could not afford to operate it as a farm and eventually sold the entire Delray group little by little.

After the foregoing purchases he started to buy up in North Palm Beach County, "way back from the coast; where it was just wild land, no one would have dreamed that anything was going to happen there." He purchased a tract, designated in an exhibit as number 21, of three hundred twenty acres, and tract number 25, of sixty-four acres. After

a year, the county wanted a right-of-way to cross the new Florida State Turnpike, and within a year or so, the Pratt & Whitney Company had purchased a five-thousand acre tract for a forty-three million dollar plant, where they were going to build jet engines; "and that was practically in the back yard of this land" which petitioner had purchased. He had no way of predicting such event, but the moment that Pratt & Whitney had purchased its tract, petitioner's land became more valuable than he had ever dreamed it would be. He had not known previously that Pratt & Whitney was going to build anything—"Didn't even know Pratt & Whitney existed." Petitioner had paid $100 an acre for sixty-four acres of tract 25, and, a year and a half later, sold it for $600 per acre. There were similar instances of quick increase in the value of land which petitioner had purchased. He had also purchased tracts of land described as the Jupiter Island Tract. Jupiter, Florida, had a lighthouse, Coast Guard Station, general store, and two or three houses. Petitioner purchased high frontage on US-1 at that point, which is the Coastal Highway, and stated that he thought it would be a good investment for his grandchildren, and that "Jupiter was about as far out of the Gold Coast area as Troy, Ohio, is out of the Cincinnati suburbs. Jupiter is almost a hundred miles north of Miami; it's not in the area where real estate was booming, but I thought, well, it was something that was good for a long term pull. I wanted to invest some money there." Tract number 18, referred to on the trial as the Jupiter Island Tract, was, in the opinion of the petitioner, "the most beautiful piece of ocean front on the whole East coast, I think. But I had that about a year and a half and somebody offered me more than twice what I paid for it, and I needed money, so I sold it, but I bought that to build on." Other property which petitioner purchased greatly increased in value when the Cape Canaveral Base was built, although neither the petitioner nor any of those associated with him had any information

that such base would be built at the time they purchased their property.

The foregoing transactions can be said to be similar to many others upon which petitioner relies to show that he did not purchase or hold the land for sale in the ordinary course of his trade or business, but rather for a long-time investment.

█ It is true, as contended by the petitioner, that a taxpayer may hold lands primarily for sale to customers in the ordinary course of his trade or business and, at the same time, hold other lands for investment. Property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business would be subject to income tax, while the property held by the taxpayer for an investment would be accorded capital-gains treatment. "[Taxpayer's] occupations regarding real estate were three kinds. He engaged in a real estate brokerage business, thus handling other persons' property, for which he was licensed * * *. He also bought properties for resale at a profit. He also bought such properties for a permanent investment. Here the burden of proof is on [the taxpayer] to show in which of the latter two categories he bought and held the * * * parcels in question." Jones v. Commissioner of Internal Revenue, 209 F.2d 415 (C.A. 9). In the foregoing case, the court held that the taxpayer's testimony as to certain property, supplemented by the admitted fact that he held the property for six years, sustained his burden of proof and that the evidence did not sustain the Tax Court's findings that the property was held for resale. See also Lobello v. Dunlap, 210 F.2d 465 (C.A. 5); Curtis Company v. Commissioner of Internal Revenue, 232 F.2d 167 (C.A. 3). A taxpayer may play a dual role in holding property for investment purposes as well as primarily for sale to customers in the ordinary course of his trade or business. Farry, 13 T.C. 8; Mieg, 32 T.C. 1314; Crabtree, 20 T.C. 841.

In this case the difficult aspect, on review, is concerned, primarily, with the taxpayer's purchase of property in Florida, of wild farm land, far from the ocean front, which was being used only for grazing of a few cattle, as well as the purchase of the Jupiter Island property, which was a long way north of the locality in Florida, where there was a real estate "boom." The purchases of all of this land, it is to be remembered, were made by the petitioner, who is a distinguished physician fully occupied with his professional duties, and who never was in Florida or away from his office on vacation for more than six weeks in a year, and never for more than a month at any one time. Yet he had such an expert eye for the desirability or value of real estate that he could almost immediately decide, after the briefest survey, on the purchase of large and small tracts, the value of which, within a short time thereafter, increased, in many cases, to an enormous extent.

However, the Tax Court, in its findings of fact, set forth that during the taxable years of 1955 and 1956, thirty-one completed, or installment, sales of property in Florida and California were made by petitioner. The properties; the periods during which they were held prior to sale; whether they represented sales out of larger tracts which petitioner had originally acquired; the nature of petitioner's interest in the properties; the percentage of cost which the gain represented; the method of payment; and the sales commissions paid—all these items were set forth separately by the Tax Court in its findings as the basis for its opinion and decision. Eighteen of these sales of property were made within two years of purchase—and, of these, ten sales of such properties were made within a year of their purchase. The other parcels were sold after holding them for various short terms—for approximately two years one month, two years three months, two years four months, two years seven months, two years eight months, and two years eleven months. The three parcels held for the longest period of time were one for three years one month, an-

other for three years eight months, and the third, four years and ten months.

It is possible that the taxpayer misunderstood the principle and application of the tax law with reference to sales of real estate, and confused such sales with sales of securities which are governed by different provisions of the statute. Thus, it appears that, on occasion, petitioner was concerned with holding a parcel of land which he had purchased for at least six months, because of his understanding that a sale of such property within a six-month period would not entitle him to capital-gains treatment. Sales of securities, held for more than a six-month period, would, during the time in question, have been entitled to capital-gains treatment, whereas sales of real estate properties, even if they had been held for more than a six-month period, would have been subject to ordinary income tax, if the property sold had been held primarily for sale to customers in the ordinary course of the taxpayer's trade or business.

It is well settled that the question whether property sold by a taxpayer at a profit was property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, within the meaning of the statute, is essentially a question of fact. Bauschard v. C. I. R., 279 F.2d 115 (C.A. 6). No single factor or test is dispositive. Among the factors considered are: (1) the purpose for which the property was acquired; (2) the purpose for which it was held; (3) improvements and their extent, made to the property by taxpayer; (4) frequency, number and continuity of sales; (5) the extent and substantiality of the transactions; (6) the nature and extent of taxpayer's business; (7) the extent of advertising to promote sales, or the lack of such advertising; and (8) listing of the property for sale directly or through brokers. Kaltreider v. Commissioner of Internal Revenue, 255 F.2d 833 (C.A. 3). While petitioner may well have purchased and held certain of these properties for investment rather than for sale in the ordinary course of

business, it was for the Tax Court, under all of the circumstances of the case, to draw its conclusions as to whether any of such purchases by the taxpayer were for investment, or was property held for sale in the ordinary course of business. The facts, and inferences to be drawn from the facts, are for the fact finder, which, in this case, is the Tax Court. On review of the Tax Court's findings and conclusions, we cannot say that they are clearly erroneous, and that is the criterion by which an appellate court must adjudicate the case.

We find no reversible error in the consideration by the Tax Court of the numerous purchases and sales of property by the taxpayer before or after the taxable years in question.

In accordance with the foregoing, the decision of the Tax Court is affirmed.