**Robert L. GRAVES; Manelle H. Graves, Plaintiffs–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE SERVICE, Defendant–Appellee.**

No. 88–1544.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 1988.

Decided Feb. 8, 1989.

Rehearing and Rehearing In Banc Denied April 21, 1989.

Charles S. Johnson, III (H. Glen Willard, Jr., Neely & Player, on brief), James B. Craven, III, for plaintiffs-appellants.

James Brooks Mann, Acting Asst. Atty. Gen. (Gary R. Allen, Barbara I. Hodges, Tax Div., Dept. of Justice, on brief), for defendant-appellee.

Before HALL and ERVIN, Circuit Judges, and KNAPP, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.

K. K. HALL, Circuit Judge:

The taxpayers, Robert and Manelle Graves, appeal from the decision of the Tax Court disallowing capital gains treatment of the profit from the sale of certain real property.[1] After a thorough review of the record, we find no error, and we affirm.

## I.

In October of 1973, Liberty Properties Corporation of South Carolina ("Liberty") purchased approximately five acres of land on Hilton Head Island, South Carolina ("Hilton Head") from the Hilton Head Company for $1,400,000. The contract to purchase restricted the use of the land to the construction of a maximum of 126 condominium units. In February of 1974, Liberty and Graves Construction Company, a company wholly owned by Robert Graves, entered into a joint venture agreement (Liberty–Graves) which called for Graves Construction to come up with a plan for the overall development of the land in exchange for fifty percent of the profits from the development.

The plan proposed by Graves Construction provided for the division of the property into four parcels, all to be developed as part of an overall master plan. The project was to be known as the Shorewood Development. Parcel one, located in the middle of the entire tract, was developed first with construction of sixteen units completed in 1974. The sixteen units were built according to the overall master plan that included an infrastructure that would be available

---

1. Manelle Graves is a party to this action solely because she filed a joint tax return with her husband in 1981.

for the future development of parcels two, three and four.[2] The remaining three parcels were developed only to the point where the infrastructure was in place.

The Liberty–Graves joint venture was terminated in March of 1977 by an agreement that provided for the purchase of parcels two, three and four by Robert Graves, individually and as president of Graves Construction. The purchase price was $400,000. The agreement provided that the development of the three parcels had to be consistent with, and complimentary to, the sixteen units on parcel one.

Prior to closing the sale, Graves entered into an agreement with an investor partnership whereby the investors would purchase parcel four from Liberty for $275,000. The same investors entered into a second agreement giving Graves and John Reed the right to buy parcel four for $275,000 and a share of any future profits realized from development of the parcel. John Reed was one of the owners of Lighthouse Realty, the realtor who sold the units on parcel one.

In March of 1977, as a direct result of Reed having arranged for the investor partnership to acquire parcel four from Liberty, Graves and Reed closed on the purchase of parcels two and three for approximately $125,000. Graves and Reed formally entered into a partnership agreement on April 1, 1977, with respect to their ownership of the property. On April 26, 1978, the Graves–Reed Partnership bought parcel four from the investors pursuant to the option agreement.

Thereafter, the Graves–Reed Partnership retained the services of Development Associates, Inc. ("DMA") to assist in the development of the land. On April 26, 1978, DMA, on behalf of Graves–Reed, submitted to the Beaufort County Joint Planning Commission an application for approval of a preliminary plat for the construction of ninety condominium units on parcels two,

three, and four. The plans that DMA submitted were consistent with the plans that Liberty–Graves had used when developing parcel one, i.e. to construct ninety units in three five-story buildings, one on each of the remaining parcels. On May 9, 1978, the Graves–Reed Partnership received preliminary planning approval to construct units on parcels two, three, and four. The approval did not require the partnership to actually undertake any development on these parcels. Final approval for the three parcels was requested from the joint planning commission on March 28, 1979.

The project on parcel four was to be known as Shorewood II, Phase I and Phase II. Construction of the thirty units was completed on September 20, 1979, and all thirty units were sold pursuant to pre-sale contracts. DMA oversaw the development and sale of these units under an agreement entered into between DMA and the Graves–Reed Partnership on March 20, 1979.

On May 23, 1979, the Forest Beach Public Service District Commission advised Graves–Reed, as well as other developers in the district, that all interested parties should submit an application by September 1, 1979, to reserve any anticipated sewer capacity requirements. Graves–Reed submitted an application to reserve sufficient sewer capacity to complete the construction of the units on parcel three, but elected not to apply for any capacity for construction on parcel two. Submission of an application required a commitment to begin construction within six months of the date of commitment and completion within eighteen months.[3]

Graves–Reed and DMA entered into a second management agreement on September 12, 1979, for the development of parcel three. All of the units were pre-sold; construction began on August 15, 1979, and was completed on July 8, 1980.

---

2. The infrastructure included all necessary underground utilities, including sewer, electricity, water, and drainage.

3. Because of a waste treatment moratorium and limits on capacity, developers were unable to

get all the capacity they wanted. The record indicates that the Graves–Reed Partnership originally asked for capacity for parcel two but then modified the application to request capacity for parcel three only.

The sales of the condominiums on parcels one, three and four were handled by Lighthouse Realty. In early 1980, an agent of Lighthouse informed John Reed that a New Jersey developer, Albert Politi, was interested in acquiring property for development on Hilton Head Island. His attention was brought to the availability of parcel two and negotiations for the sale of that parcel began.

On June 30, 1980, the Graves–Reed Partnership was terminated by agreement of the partners. Graves received a one-half interest in parcel two and one-half interest in twenty-one condominium units. Graves recognized ordinary income on his gain from the sale of the condominiums on his 1980 tax return.

In 1981, Graves sold his one-half interest in parcel two to Politi for $750,000. He treated the income from the sale as a capital gain. The Commissioner subsequently disallowed capital gains treatment of the sale and notified Graves of a deficiency of $301,311.

The Tax Court agreed with the Commissioner and concluded that parcel two was held for sale in the ordinary course of the partnership's trade or business and that the gain on the sale was therefore taxable as ordinary income and not as a capital gain under 26 U.S.C. § 1221.[4] The court denied a motion for reconsideration filed by Graves. This appeal followed.

## II.

On appeal Graves contends that he held parcel two as an investment, rather than for development, and therefore, the profit he realized from its sale was appropriately listed on his tax return as a capital gain.

The Commissioner, on the other hand, contends that the evidence clearly shows that Graves held parcel two for development purposes, just as he held parcels three and four. The Tax Court agreed with the Commissioner's contention below and so do we.[5]

■ Several factors are relevant in determining whether property sold by a taxpayer at a profit was property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business within the meaning of Section 1221(1). Among the factors to be considered are: (1) the purpose for which the property was acquired; (2) the purpose for which it was held; (3) improvements and their extent, made to the property by taxpayer; (4) frequency, number, and continuity of sales; (5) the extent and substantiality of the transaction; (6) the nature and extent of taxpayer's business; (7) the extent of advertising or lack thereof; and (8) listing of the property for sale directly or through a broker. *Mathews v. Commissioner*, 315 F.2d 101 (6th Cir.1963). These factors are merely to aid in determining whether capital gains treatment is appropriate and no one factor or combinations of them is necessarily controlling. *Thompson v. Commissioner*, 322 F.2d 122 (5th Cir.1963).

■ In this case the result that these factors counsel depends upon the success of Graves' efforts to have us view parcel two in isolation from the other three parcels. The Tax Court made an explicit finding that parcel two was linked to one, three, and four in almost every material way. Development of parcel two was anticipated as the sales literature and promotional materials on the other parcels indicated; actual models of condominium

---

**4.** Section 1221 of the Internal Revenue Code defines "capital asset" for purposes of determining capital gain or loss as follows:

For purposes of this subtitle, the term capital assets means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) ... property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

**5.** The parties are not in agreement on the standard of review by which this case is governed.

However, the correct standard is stated in *Turner v. Commissioner*, 540 F.2d 1249 (4th Cir. 1976), where we held that the ultimate conclusion of whether property sold by a taxpayer at a profit was property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, within the meaning of the statute, is a question of law. Resolution of the subordinate facts, however, is subject to the clearly erroneous rule. It is under this standard that we review this case.

units located on parcel two were part of the models exhibited to the public in connection with the sale of units on the other parcels; and preliminary and final planning commission applications for development of the other three parcels all included parcel two as property to be developed.

Graves would have us treat the sale of parcel two as a capital gain because that parcel, unlike the others, was undeveloped. That fact, in itself, is not dispositive when there is evidence that shows that there were plans to develop the property. We decline the invitation to treat parcel two as an entity separate and apart from the other parcels. Graves clearly intended to develop all of the property in the ordinary course of his business; he merely opted to develop the more valuable ocean-front property, parcels three and four first, and the less attractive non-oceanfront parcel two, later. When he was presented with an "unbelievable" offer from another developer, he accepted.

 Although a taxpayer may be able to establish that certain parcels were held primarily for investment while others were held for development, there is a heavy burden on him to establish the segregation of the parcels. *Slappey Drive Ind. Park v. United States*, 561 F.2d 572 (5th Cir.1977). The mere lack of development activity does not sufficiently separate one parcel from the others, particularly in this case where the objective evidence leads to the inference of future development and where there is no indication that Graves had completely severed parcel two from the others and abandoned his intent to develop the parcel and sell condominiums in the ordinary course of his business. Under the circumstances, we find the conclusion inescapable that Graves was holding parcel two for development. The record shows that the *Mathews* factors require ordinary income treatment.

Graves claims that he purchased all three parcels of land as an investment and while the purpose of holding parcels three and four changed to one of development, the purpose of holding parcel two remained as investment. Although we agree that the intent with which property is held can change, *Suburban Realty Co. v. United States*, 615 F.2d 171, 178 (5th Cir.1980), cert. denied, 449 U.S. 920, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980), the facts in this case simply do not show that to be the case here. Even if investment were a secondary or peripheral motive for holding the property, clearly development was the primary purpose in holding it, and that is the purpose that is important under the statute.

We conclude that the Tax Court did not err in holding that the sale of parcel two was a sale in the ordinary course of Graves' business and that the profit realized was properly taxed as ordinary income. Accordingly, the judgment of the Tax Court is affirmed.

AFFIRMED.