WILLIAM B. DUVAL AND GENE H. DUVAL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
DuVal v. Commissioner
Docket No. 25722-92
United States Tax Court
T.C. Memo 1994-603; 1994 Tax Ct. Memo LEXIS 611; 68 T.C.M. (CCH) 1375; December 12, 1994, Filed *611 Decision will be entered under Rule 155. For petitioners: Harold E. Starke, Jr.
For respondent: John C. McDougal. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Additions to Tax Section Section Section Section
Section Year
Deficiency
6653(a)(1) [1]
6653(a)(1)(A)
6653(a)(1)(B)
6653(a)(2)
6661(a)
1985
$  73,409
$ 3,670
$   --  $ --
$ *
$ 2,496
1986
268,369
--  13,418 *
--
3,237
* 50 percent of the interest due on the portion of the underpayment
attributable to negligence. Respondent determined that $ 9,983 of the
deficiency for 1985 and $ 12,946 of the
deficiency for 1986 were attributable
to negligence.
The issues remaining for decision *612 are whether petitioners are entitled for 1986 to a charitable contribution deduction under section 170(a) and, if so, whether that deduction is limited by section 170(e)(1)(A) to petitioners' basis in the contributed property. We hold that petitioners are entitled to a charitable contribution deduction and that the amount of that deduction is not limited by section 170(e)(1)(A). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners William B. DuVal (Mr. DuVal) and Gene H. DuVal, who are husband and wife, resided in Richmond, Virginia, at the time the petition was filed. Petitioners timely filed (under extensions) joint income tax returns for taxable years 1985 and 1986 on October 17, 1986, and August 15, 1987, respectively. On August 20, 1992, respondent timely mailed to petitioners a notice of deficiency for 1985 and 1986 (notice). During the years at issue, petitioners operated a sole proprietorship, known as "DuVal Development" (DuVal Development), that engaged in the business of acquiring raw land, generally having it rezoned so as to be consistent with its intended use, and subdividing it into building lots, most of which were sold to builders *613 of single family homes. The subdivision activity of DuVal Development consists of design and engineering work and development work, such as the completion of roadways and water and sewer lines. Prior to physical development work, such as clearing and grading, DuVal Development must engage in substantial engineering and design work and must submit a series of plans for the proposed development to the appropriate governmental authority. The actual site work (i.e., physical development) begins sometime between a few months to more than a year after the closing date for the purchase of the land that is to be developed. Few, if any, of the lots in DuVal Development subdivisions are ready for closing in the first taxable year in which improvements begin in those subdivisions. The bulk of the lots in each subdivision are not ready for closing until the second, third, or even fourth year of development. Most of DuVal Development's subdivision projects require from two to five years until all of the lots are sold to third parties. Many subdivisions, however, are comprised of individual sections, and the development and sell-off of each individual section are generally completed within *614 a shorter period of time. In addition to subdividing real estate for residential development, during 1985 and 1986, petitioners engaged through DuVal Development in three other projects, namely, Reymet Industrial Park (Reymet), Cloverleaf West Office Park (Cloverleaf), and Oak Lake Business Center (Oak Lake). Reymet was a five-lot industrial park developed in a manner similar to DuVal Development's residential projects; that is to say, DuVal Development (1) planned the development, (2) rezoned, cleared, installed water and sewer lines in, and subdivided the property, and (3) sold the lots to purchasers who typically built warehouses thereon. Oak Lake was an industrial park similar to Reymet. Cloverleaf was an office condominium project in which DuVal Development purchased the land, had it zoned for office use, improved the site, hired a firm to build two office condominiums, and sold the condominiums. During the same period (i.e., 1985 and 1986), petitioners also attempted to develop another small industrial park, but were unable to acquire all of the land necessary to complete that project. Development of property for residential, office, or industrial use is to be contrasted *615 with development of property for commercial use, i.e., retail shopping and restaurants, in that the latter does not involve subdivision of the property into lots. As of the date of trial, petitioners had never engaged in the development of property for commercial use. In July 1985, petitioners acquired for $ 2,143,000 approximately 429 acres of land (Deer Run land) for the Deer Run I subdivision. That land, which had been originally zoned for agricultural use, is located on U.S. Route 360 (Route 360) in Chesterfield County (the County), Virginia. Petitioners had wanted to purchase only the approximately 348 acres of the Deer Run land that were not located directly along Route 360 (rear parcels) and that they thought were suitable for development as residential property. Petitioners had not been interested in acquiring the remaining acres that fronted directly on Route 360 (front parcels) and that were more suited for development for various business uses. However, the owner of the Deer Run land (owner) had informed petitioners that they could acquire the rear parcels only as part of a package with the front parcels. Thus, petitioners purchased all of the Deer Run land, i.e., *616 the front parcels as well as the rear parcels. At the time they purchased the Deer Run land, petitioners intended to hold the front parcels as an investment for five years before selling them; they did not intend to use those parcels in their real estate development business. Petitioners' contract with that owner provided that petitioners could not develop or sell the front parcels until they were ready to pay off the note they issued to the owner when they acquired the Deer Run land. To distinguish the front parcels from the rear parcels, petitioners carried the front parcels on their books as "Deer Run Commercial". On January 18, 1985, prior to purchasing the Deer Run land, Mr. DuVal formally applied to the County pursuant to the Conditional Use Planned Development (CUPD) procedures of section 21-34 of the County Zoning Ordinance (Zoning Ordinance) to have that land rezoned (rezoning request). The Zoning Ordinance, which was enacted pursuant to that portion of the Virginia Code authorizing the creation of zoning ordinances, see Va. Code Ann. secs. 15.1-486 through 15.1-498 (Michie 1986), provides for the types of zoning in the County, the methods to be used to rezone property, *617 and other rules regarding the use of property in the County. About the time Mr. DuVal filed the rezoning request for the Deer Run land, the CUPD procedures were the primary rezoning procedures used by the County. That was because they allowed maximum flexibility to both the developer and the County. Pursuant to the CUPD procedures in effect during the years at issue, a developer could ask for variations from the rules contained in the Zoning Ordinance, and the County could impose conditions on its approval of a rezoning application. By way of illustration, Mr. DuVal requested, and received, a bulk exception from the Zoning Ordinance rules regarding the size of lots to be located on the rear parcels of the Deer Run land. The County would have been reluctant to approve a request for rezoning that did not include all of the Deer Run land. Therefore, even though petitioners did not intend to develop the front parcels, in order to facilitate his requested rezoning of the rear parcels, Mr. DuVal applied to have all of the Deer Run land rezoned (i.e., the front parcels as well as the rear parcels). Under the development plan submitted by Mr. DuVal as part of the rezoning request, *618 the rear parcels were to be developed into residential lots. In order to allow a future purchaser of the front parcels maximum flexibility for development, Mr. DuVal sought to have those parcels rezoned for various business uses, including 16 acres for office use, 38 acres for commercial use, and approximately 17 acres for light industrial use. Mr. DuVal's proposed development of the Deer Run land was consistent with the County's Comprehensive Plan (Comprehensive Plan) that was on file at the time he submitted the rezoning request; that is to say, it was consistent with the County's plan that set forth its anticipated use of the land located in the area affected by the plan, including expected zoning changes. At the time Mr. DuVal submitted the rezoning request for the Deer Run land, Roy Crawford (Mr. Crawford) was a principal planner or planning administrator with the County. As part of his duties, Mr. Crawford was assigned as the lead planner responsible for reviewing and making a recommendation to the County's Planning Commission[2] regarding that request. Mr. Crawford's responsibilities included ensuring that Mr. DuVal's rezoning request complied with the County's Comprehensive *619 Plan and Zoning Ordinance. He also was responsible for negotiating any improvements that the County wanted, such as turn lanes, and any dedications of land, i.e., donations of land or other property by developers for public purposes. Most of the contact between petitioners and the County regarding Mr. DuVal's rezoning request was through Mr. Crawford. During the 1970s and 1980s, the County was experiencing a period of rapid growth that was outstripping its resources for capital development. Consequently, the County operated under a policy of soliciting dedications of land from developers whenever a proposed development was in the location of a planned capital improvement of the *620 County. It was not clear to the County during the years at issue whether it could legally require developers to dedicate land as a condition for approval of a request for rezoning where the planned improvement was not mandated by the planned development itself. [3] See Va. Code Ann. sec. 15.1-491.2 (Michie 1986). Nonetheless, the County operated during those years under a policy that assumed that it did have such authority under the CUPD procedures. Prior to the time Mr. DuVal formally applied in 1985 for rezoning of the Deer Run land, Mr. DuVal, Mr. Crawford, and other representatives of DuVal Development and the County *621 participated in preliminary negotiations to discuss the matter. Sometime during the course of those negotiations, County officials brought to Mr. DuVal's attention that the County's Capital Improvements Plan (CIP) (i.e., its list of proposed capital improvements, projected costs of those improvements, and desired location of those improvements) included a proposal for a library in the general area in which the Deer Run land was located. The County representatives asked Mr. DuVal at that time whether he would be willing to donate a portion of the Deer Run land as a site for the proposed library (library site). After discussions with his wife, Mr. DuVal decided to donate land for a library site to the County because he wished to give something back to the County in which all of petitioners' prior developments were located and because he was an advocate of education. Consequently, sometime prior to the formal filing in 1985 of the rezoning request by Mr. DuVal, petitioners agreed to transfer land to the County for use as a library site. Neither Mr. Crawford nor any other County representative informed or suggested to Mr. DuVal or Delmonte Lewis (Mr. Lewis), his engineer for the *622 proposed Deer Run development project, that the rezoning request with respect to the Deer Run land would not be approved if petitioners did not transfer property to the County for a library site. Indeed, the building of a library was not a mandated planned improvement for the Deer Run land. Nor did Mr. DuVal believe or anticipate that his rezoning request would be denied if petitioners did not transfer to the County land for use as a library site. In this connection, petitioners had developed approximately 10 subdivisions in the County prior to 1985 and had never been required to make a dedication to the County in order to obtain the requested rezoning for those subdivisions. On June 26, 1985, the County Board of Supervisors (County Board) approved Mr. DuVal's rezoning request. The rezoning request as approved by the County Board contained the following language: In conjunction with the first schematic/tentative plan submission, the developer shall submit an acceptable proposal for dedication of a minimum of four (4) acres for a library site either on or in the vicinity of Parcel F. Dedication shall be established at the time of schematic plan review.
The above-stated *623 language was originally added as an addendum to Mr. DuVal's rezoning request by the County's Planning Commission. It was written into the rezoning request as a procedural matter, and it was not intended to, and did not, impose a condition precedent to the County's approval of Mr. DuVal's rezoning request. Subsequent to the County Board's approval of the rezoning request, Mr. DuVal and Mr. Lewis engaged in a number of discussions with County representatives concerning the exact size and location of the land that petitioners would transfer to the County for a library site. On November 17, 1986, petitioners transferred to the County four acres of the Deer Run land (transferred property or property in question) that were located on certain of the front parcels located directly along Route 360 at the intersection of Deer Run Drive. Petitioners transferred the property in question directly along Route 360 because the County convinced them that it was necessary to have exposure along that route in order for the library site to be of maximum value to the County. Petitioners did not agree to, and did not, transfer the property in question to the County in exchange for, or in anticipation *624 of, the County's approval of the rezoning request in respect of the Deer Run land. Rather, they intended to make a gift to the County. Petitioners proceeded to develop through DuVal Development the rear parcels of the Deer Run land as residential property. They (1) built two feeder roads that ran from Route 360 through the front parcels in order to provide access to the rear parcels, (2) ran a trunk sewer line to the Deer Run land, (3) built drainage facilities on it, and (4) built turn lanes on Route 360. All of those improvements were necessary to the development of the rear parcels. Although petitioners did not at any time after they acquired the Deer Run land advertise the front parcels for sale, or list them with a broker, sometime between 1988 and 1990, Robert Staples (Mr. Staples), a commercial real estate developer, approached Mr. DuVal to express his interest in buying most of the undeveloped front parcels of that land (undeveloped front parcels). Shortly after being approached by Mr. Staples, petitioners sold him those parcels for over $ 3,000,000. Since petitioners' sale of the undeveloped front parcels through the time of the trial herein, they did not acquire any *625 other raw land for the purpose of selling it to other developers in an undeveloped state. After he purchased the undeveloped front parcels, Mr. Staples was required to have the zoning for those parcels modified in order to suit his purposes. Those parcels have subsequently been partially developed for commercial use as retail shopping and restaurant sites. At the time of the sale to Mr. Staples, the front parcels were still wooded parcels on which, except for the two feeder roads designed to provide access to the rear parcels and the utilities in those roads, petitioners had not performed any clearing work and as to which they had not requested Mr. Lewis, their engineer, to draw up any property development plans. As part of the sale of the undeveloped front parcels to Mr. Staples, petitioners were required to complete construction of one of the feeder roads that was cut through the undeveloped front parcels. The feeder roads, including the one cut through the undeveloped front parcels, primarily served as access to the rear parcels and would have been completed even if the undeveloped front parcels had not been sold. In addition to transferring the property in question to the *626 County in 1986, petitioners made other transfers of land for public or charitable purposes both before and after that year. On December 14, 1984, petitioners donated to the University of Richmond a lot in the City of Richmond that had an appraised value of $ 88,000. On September 25, 1989, petitioners donated 2.59 acres of raw land in the County, valued at $ 13,500, to Union Branch Baptist Church. Sometime during 1993, petitioners donated 30 acres to Henrico County for use as a public park. Petitioners' basis in the transferred property was $ 70,650. The appraised fair market value of that property at the time of its transfer was $ 280,000. The transferred property had increased in value because (1) an expressway extension to the area had been built; (2) petitioners had the Deer Run land rezoned; and (3) a trunk sewer line had been made available to the site as a result of petitioners' subdivision of the rear parcels on the Deer Run land into residential property. In their Federal income tax return for 1986, petitioners claimed a charitable contribution deduction in the amount of $ 103,675 with respect to the transfer of the property in question to the County. Petitioners calculated *627 that deduction on the basis of the appraised fair market value of the property (i.e., $ 280,000), as reduced by the adjusted gross income limitations contained in section 170(b)(1)(A) that were applicable to a charitable contribution made by an individual to, inter alia, a governmental unit. OPINION Respondent determined in the notice that the transfer to the County of the property in question was not a charitable contribution within the meaning of section 170(c); she therefore denied petitioners' claimed charitable contribution deduction. Respondent further determined in the notice that, in the event that transfer were held to qualify as a charitable contribution, petitioners' deduction would be limited by section 170(e)(1)(A) to their basis in the transferred property. Petitioners challenge respondent's determinations. They bear the burden of establishing that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Charitable Contribution -- Contribution or Gift
Section 170(a) provides that a taxpayer is entitled to a deduction for any charitable contribution as defined in section 170(c) that is *628 made during the taxable year. As pertinent here, section 170(c)(1) defines the term "charitable contribution" to mean a contribution or gift to or for the use of a political subdivision of a State, provided that the contribution or gift is made for exclusively public purposes. The only dispute here is whether petitioners' transfer of the property in question was a contribution or a gift. To determine whether a taxpayer has made a charitable contribution, courts generally focus on whether the transfer constitutes a gift. See Osborne v. Commissioner, 87 T.C. 575, 581 (1986); DeJong v. Commissioner, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). A transfer does not qualify as a gift to the extent it is impelled primarily by the anticipation of some economic benefit or is in fact an exchange in the form of a substantial quid pro quo. Osborne v. Commissioner, supra; Rusoff v. Commissioner, 65 T.C. 459, 469 (1975), affd. 556 F.2d 559 (2d Cir. 1977); see United States v. American Bar Endowment, 477 U.S. 105, 116-117 (1986). *629 Thus, if a transfer is made under compulsion of a local ordinance or in exchange for, or in anticipation of, a zoning change, no gift is made, since the transferor intended to receive an economic benefit in exchange for the transfer. See Osborne v. Commissioner, supra; Rusoff v. Commissioner, supra.
To resolve the question of whether a transfer is a gift for purposes of section 170(c), we must determine the taxpayer's primary or dominant intent or purpose in making the transfer. Elrod v. Commissioner, 87 T.C. 1046, 1076 (1986); Pettit v. Commissioner, 61 T.C. 634, 639 (1974). The inquiry into the taxpayer's primary or dominant intent is a question of fact. Elrod v. Commissioner, supra.To resolve this question, we do not examine only the taxpayer's statements of his or her subjective intent. Rather, we must make an objective inquiry into the nature of the transaction to determine whether what is labeled as a gift is in substance a gift. Pettit v. Commissioner, supra at 638-639; *630 Sutton v. Commissioner, 57 T.C. 239, 243 (1971). Respondent contends that petitioners transferred the property in question to the County in exchange for, or in anticipation of, its approval of the rezoning request in respect of the Deer Run land. In support of her position, respondent called Beverly Musselman (Ms. Musselman) as a witness. [4] *632 Ms. Musselman was a principal planner or planning administrator with the County prior to and after the time Mr. DuVal formally submitted the rezoning request to the County. Her responsibilities with respect to that request related solely to the front parcels that petitioners were seeking to have rezoned for various business uses, and not to the rear parcels which they were seeking to have rezoned for residential use and for which Mr. Crawford was responsible. Ms. Musselman testified generally about the policy in effect during 1985 and 1986 under which the County attempted to require a developer to dedicate land during the time it was considering the developer's rezoning application. She testified that, whenever a capital improvement was planned in an area located near land for which a developer had made a rezoning *631 application, the County typically discussed with the developer the possibility of his or her dedicating that land for that planned improvement. According to Ms. Musselman, if the developer refused to make the dedication, the County would either approve the rezoning application on the condition that that land was to be dedicated or deny the application outright. Ms. Musselman further testified that it was unclear to the County whether it had the authority to require such a dedication as a condition to approval of a request for rezoning where the proposed development did not give rise to the need for the proposed improvement. [5] Nonetheless, according to Ms. Musselman, the County's policy was to attempt to exercise such authority, until it was challenged, through the CUPD procedures. Respondent argues that petitioners transferred the property in question to the County because of the above-described policy in effect during 1985 and 1986 about which Ms. Musselman testified. Specifically, respondent contends *633 that petitioners' primary purpose for transferring the property in question to the County was to secure approval of the rezoning request. Petitioners do not dispute that the County had a policy during the years at issue of attempting to force developers to dedicate land as a condition to approval of a rezoning application that was being processed under the CUPD procedures. However, they contend that their transfer of the property in question to the County was not intended to be, and was not, in exchange for, or in anticipation of, approval by the County of the rezoning request in respect of the Deer Run land. Mr. DuVal, whom the Court found totally credible, testified that no one from the County ever informed or suggested to him that his rezoning request would be denied if he did not transfer a portion of that land to the County as a library site. Both Mr. Crawford, the County's primary contact with Mr. DuVal and lead planner with respect to Mr. DuVal's rezoning request in respect of the Deer Run land, and Mr. Lewis, petitioners' project engineer for that land, both of whom the Court also found totally credible, corroborated Mr. DuVal's testimony that the County had not expressly *634 or impliedly conditioned its approval of his rezoning request on petitioners' agreement to transfer to the County a portion of the Deer Run land as a library site. In fact, Mr. Crawford testified that he was surprised and "ecstatic" to learn that petitioners were willing to make such a transfer. He also testified that he would have approved the rezoning of the Deer Run land that was requested by Mr. DuVal even if the land for the library site had not been transferred to the County by petitioners. Although Ms. Musselman testified about the County's general policy of attempting to require dedications, she acknowledged that she had no knowledge of whether the County's policy was followed with respect to Mr. DuVal's rezoning request for which Mr. Crawford was the County's lead planner. In an effort to further support her argument that petitioners' primary purpose in transferring the land in question was to secure approval of the rezoning request in respect of the Deer Run land, respondent contends that the County's approval of that request was expressly conditioned upon the dedication by petitioners of certain land for the library site. However, Mr. Crawford explained in his testimony *635 that the language requiring the submission of a plan by petitioners regarding the dedication of certain land for a library site was added to Mr. DuVal's rezoning request by the County Planning Commission as a procedural matter and that it was not a condition precedent to approval of that request. In this regard, even though Mr. DuVal agreed to transfer certain land for a library site prior to filing his rezoning request in 1985, he did not include the dedication as part of that request. Thus, not only Mr. Crawford, but also Mr. DuVal, did not regard the dedication as a condition precedent to approval of Mr. DuVal's rezoning request. Respondent also contends that the fact that petitioners engaged in negotiations with the County as to the exact size and location of the land to be transferred for the library site indicates that petitioners did not voluntarily transfer the property in question to the County. In this connection, although petitioners attempted to persuade the County to accept land fronting directly on Deer Run Drive, and not on Route 360, they eventually transferred land fronting directly on Route 360 as the County desired. Respondent argues that if, as petitioners *636 claim, the rezoning request were not conditioned on the transfer of land for the library site, petitioners could have transferred the land located along Deer Run Drive. On the instant record, we disagree with the motive that respondent attempts to impute to petitioners' actions. Mr. DuVal testified that the reason petitioners gave the County the property in question along Route 360 was that they were persuaded by and agreed with the County that the library should have exposure along that route in order to be of maximum value to the County. On the instant record, we find that petitioners had no reason to believe, or anticipate, that Mr. DuVal's rezoning request in respect of the Deer Run land would be denied if they did not transfer the property in question to the County. That request complied with the County's Comprehensive Plan in effect during 1985 and 1986. In addition, petitioners developed several projects of similar size in the County prior to that time and never were required to dedicate land as a condition to approval of their requests for rezoning. Although the CUPD procedures may have given the County colorable legal authority [6] to attempt to require the dedication *637 of property as a condition to rezoning, based on the entire record in this case, we find that petitioners did not primarily intend their transfer of the property in question to be in exchange for, or in anticipation of, the County's approval of the rezoning request for the Deer Run land. We further find that petitioners intended to, and did in fact, make a contribution or gift of the transferred property to the County. Accordingly, we hold that petitioners are entitled under section 170(a) to a charitable contribution deduction for 1986 for that property. *638 Amount of Charitable Contribution Deduction
We now turn to whether the amount of petitioners' charitable contribution deduction is limited by section 170(e)(1)(A) to petitioners' basis in the contributed property. Section 170(e) provides in pertinent part: (1) GENERAL RULE. -- The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of -- (A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution) * * *
Respondent does not dispute that petitioners held the property in question for at least one year before they contributed it to the County and that therefore, assuming arguendo that that property were a capital asset, any gain that it would have generated would be long-term capital gain. However, respondent disputes that the property in question was a capital asset in petitioners' hands at the time they gave it to the County. Section 1221 provides that "the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade *639 or business), but [as relevant here] does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Sec. 1221(1). To determine whether section 170(e)(1)(A) applies here, we must decide whether petitioners held the transferred property primarily for sale to customers in the ordinary course of their real estate development business. This inquiry is a question of fact. Pasqualini v. Commissioner, 103 T.C. 1, 6 (1994); Pritchett v. Commissioner, 63 T.C. 149, 162 (1974). Each case must be decided on its own facts and circumstances. Thompson v. Commissioner, 322 F.2d 122, 127 (5th Cir. 1963), affg. in part and revg. in part 38 T.C. 153 (1962). Courts often cite the following factors in determining whether property is held primarily for sale to customers in the ordinary course of a trade or business: (1) The purpose for which the property was acquired; (2) the purpose for which it was held; (3) the extent of improvements made to the property by the taxpayer; (4) the frequency, number, and continuity *640 of sales of the property; (5) the extent and substantiality of the disposition of the property; (6) the nature and extent of the taxpayer's business; (7) the extent of any advertising of the property; and (8) the listing of the property for sale directly or through a broker. Graves v. Commissioner, 867 F.2d 199, 202 (4th Cir. 1989), affg. an Oral Opinion of this Court. No single factor, or combination thereof, is necessarily controlling. Graves v. Commissioner, supra;Guardian Indus. Corp. v. Commissioner, 97 T.C. 308, 316 (1991), affd. without published opinion 21 F.3d 427 (6th Cir. 1994). Objective factors carry more weight than a taxpayer's subjective statements of his or her intent. Guardian Indus. Corp. v. Commissioner, supra.
It is undisputed that petitioners were in the business of acquiring raw land in order to subdivide it into building lots, most of which were sold to builders of single family homes. Petitioners argue that the front parcels of the Deer Run land, where the library site is located, were of a different *641 character in their hands from the type of land they usually purchased and developed in that those parcels were acquired and held by them for investment, and not development, purposes. Respondent argues that the front parcels were not of a different character in petitioners' hands from the character of the land they usually purchased and developed. On the present record, we agree with petitioners. Although a taxpayer in the real estate business may acquire and hold real property primarily for sale to customers in the ordinary course of that business, he or she may hold other real property as a capital investment. Turner v. Commissioner, 540 F.2d 1249, 1252 (4th Cir. 1976), revg. T.C. Memo. 1974-264. Petitioners bear the burden of proving that they held the property in question as investors, rather than as dealers. Pritchett v. Commissioner, supra at 164. Based on our review of the entire record in this case, we find that petitioners have satisfied their burden. We have found that petitioners wanted to purchase only the rear parcels of the Deer Run land. However, the owner insisted *642 upon selling all of that land as a package. Consequently, in order to acquire the rear parcels, which petitioners planned to subdivide into residential lots to be sold to builders of single family homes, they agreed to buy all of the approximately 429 acres of the Deer Run land, including the front parcels, which they intended to hold as an investment. Consistent with their intended development of the rear parcels, petitioners requested that such parcels be rezoned for residential use. The County would have been reluctant to approve a request for rezoning of only the rear parcels, rather than all of the Deer Run land. Consequently, petitioners sought to have the front parcels, as well as the rear parcels, rezoned. In order to allow a future purchaser of the front parcels maximum flexibility for development, Mr. DuVal requested that those parcels be rezoned for various business uses. Business uses were the best uses of property, like the front parcels, that were located directly on Route 360. Although Mr. DuVal had the front parcels rezoned for multiple business uses, their best use appears to have been commercial use, i.e., retail shopping and restaurants. As of the time of *643 the trial herein, petitioners had never engaged in any development of property for commercial use. More than half of the acreage of the front parcels was rezoned for commercial use. In fact, most of the front parcels were purchased from petitioners by a commercial developer and were thereafter partially developed for commercial use. When petitioners acquired the Deer Run land in July 1985, they intended to hold the front parcels for about five years. Sometime between 1988 and 1990, they sold most of those parcels to Mr. Staples because Mr. Staples made an offer to purchase them for an amount in excess of $ 3,000,000, which Mr. DuVal testified was significantly greater than what petitioners believed those parcels were worth. It is also significant that petitioners sold the undeveloped front parcels to Mr. Staples in one transaction around 1989. Since that time through the time of the trial herein, they did not acquire any other raw land for the purpose of selling it to other developers in an undeveloped state. Petitioners did not advertise the front parcels for sale; nor did they list them with a broker. Rather, Mr. Staples, who purchased the undeveloped front parcels, sought *644 out petitioners. Moreover, when petitioners sold the front parcels, they consisted of wooded land that was in an essentially undeveloped state. Although petitioners cut two feeder roads through the front parcels in order to provide access to the rear parcels and put utilities in those roads, those improvements were necessary to the development of the rear parcels. That some of petitioners' subdivision activities with respect to the rear parcels increased the value of the front parcels does not necessarily mean that petitioners were holding the front parcels primarily for sale to customers in the ordinary course of their business. We also note that petitioners did not ask their engineer to draw plans for the subdivision of the front parcels. Such plans must be prepared and submitted to the County for approval prior to the physical development of any property. Furthermore, petitioners carried the front parcels separately on their books as "Deer Run Commercial". In fact, Mr. DuVal testified that he attempted to create a separate entity to hold the front parcels, but was prohibited from doing so by the contractual prohibition against selling or developing the front parcels prior *645 to paying off the note on the Deer Run land. We have considered all of the contentions of respondent relating to the issue of whether petitioners were holding the front parcels in question primarily for sale to customers in the ordinary course of their business. After review of the record taken as a whole, we reject respondent's position. Based on our review of the entire record in this case, we find that petitioners did not intend to, and did not, hold the front parcels primarily for sale to customers in the ordinary course of their business. Accordingly, we hold that petitioners' charitable contribution deduction for the transferred property for 1986 is not limited by section 170(e)(1)(A) to petitioners' basis therein. Rather, petitioners are entitled to deduct under section 170(a) an amount equal to the fair market value of that property, see sec. 1.170A-1(c)(1), Income Tax Regs., as reduced by the adjusted gross income limitations contained in section 170(b)(1)(A). To reflect the foregoing and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Although it is not clear from the record, the Planning Commission appears to be an administrative body that reviews rezoning applications and makes an initial determination as to whether the County will approve those applications. The Planning Commission also appears to report to the County Board of Supervisors regarding its findings.↩
3. A planned improvement is mandated (mandated planned improvement) by a development itself if the development is expected to attract enough people or other business so as to cause the County's current facilities to be inadequate. By way of illustration, a large development may give rise to a need for a new school because the development is expected to draw a large number of families to the area.↩
4. Respondent also called William H. Wilson, Jr. (Mr. Wilson), the revenue agent assigned to examine petitioners' tax returns for the years at issue. Mr. Wilson testified that, during the course of initial interviews in 1988 that were conducted as part of his examination, Mr. DuVal stated that if the County requested a dedication of land, a developer could not have property rezoned in the County without making the dedication requested by the County. On cross-examination, however, Mr. Wilson admitted that he did not know the time frame to which Mr. DuVal's comment related, i.e., whether the comment was referring to the period around 1985 when petitioners agreed to transfer the land in question or whether the comment was referring to the period around 1988 when the interview was taking place. Mr. DuVal testified that his comment with respect to which Mr. Wilson testified related to the policy of the County as it existed at the time of his discussions with Mr. Wilson during 1988 and that he was not referring to the County's policy as it existed at the time in 1985 when petitioners agreed to, and in 1986 when petitioners did, transfer the property in question to the County. Specifically, Mr. DuVal testified that his statements to Mr. Wilson during 1988 were referring to the situation encountered by a friend of his who had been asked to dedicate land for a school in a subdivision he was developing about 1988. Mr. DuVal further testified that a new planning director was coming into office around the time of the interview during 1988 and that developers in the County believed that the new planning director would be more aggressive in soliciting dedications of land. Petitioners also called Joe Manion (Mr. Manion) who prepared petitioners' tax return for 1986 (as well as their 1985 return) and who was present at the interviews during 1988 that were conducted by Mr. Wilson. Mr. Manion's testimony was substantially the same as Mr. DuVal's; that is to say, he testified that the comments to which Mr. Wilson testified related to the County's policy as it existed during 1988 at the time of those interviews. Under the foregoing circumstances, in resolving the issue of whether petitioners made a charitable contribution in 1986, we are unwilling to place any weight on Mr. Wilson's testimony regarding what he was told by Mr. DuVal when he interviewed him during 1988.↩
5. During the years at issue, Va. Code Ann. sec. 15.1-491.2 (Michie 1986), which applied to conditional zoning, provided in relevant part: A zoning ordinance may include and provide for the voluntary proffering in writing, by the owner, of reasonable conditions * * * provided that (i) the rezoning itself must give rise for the need for the conditions; * * * (iv) such conditions shall not include mandatory dedication of real or personal property * * *.
Pursuant to the foregoing section, the Zoning Ordinance provided for procedures for conditional zoning in sec. 21-35 of the County Code. Those procedures were separate from the CUPD procedures that were prescribed by sec. 21-34 of the County Code. It is unclear whether the limitations contained in Va. Code Ann. sec. 15.1-491.2↩ applied to the CUPD procedures. In light of our holding, we need not resolve that question.
6. Petitioners devote much of their argument to whether the County had the actual authority to require a dedication where it was not a mandated planned improvement. However, assuming arguendo that the Court were to have found in the instant case, which it did not, that petitioners transferred the property in question with the primary intention of exchanging it for approval of the rezoning request in respect of the Deer Run land, it would not appear to have mattered whether the County had the actual authority to require the dedication. See Perlmutter v. Commissioner, 45 T.C. 311, 316↩ (1965).